# Exhibit 1

WILCOXEN CALLAHAM, LLP
DANIEL E. WILCOXEN, SBN 054805
DREW M. WIDDERS, SBN 245439
2114 K Street
Sacramento, California 95816
Telephone: (916) 442-2777
Facsimile: (916) 442-4118
email: dwilcoxen@wilcoxenlaw.com
email: dwidders@wilcoxenlaw.com

Superior Court of California
County of Butte

FILED

OCT 11 2016

Kimberly Flener Clerk
By _____ Deputy

# IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF BUTTE

GABRIEL ISAIAH SANCHEZ ELDRIDGE
by and through his guardian ad litem,
EDDIE SANCHEZ,

          Plaintiff,

  -vs-

CITY OF CHICO, CHICO POLICE
DEPARTMENT, MARK BASS and DOES
1 through 100, inclusive,

          Defendants.

_____/

CASE NO.: **16CV 02323**

COMPLAINT FOR DAMAGES
[Unlimited Jurisdication]

Plaintiff GABRIEL ISAIAH SANCHEZ ELDRIDGE, by and through his guardian ad litem

EDDIE SANCHEZ, herein complain against Defendants as follows:

## INTRODUCTION

1.    This action alleges civil rights violations and other state and federal claims based on the

wrongful death of Eddie Gabriel Sanchez by the CITY OF CHICO, CHICO POLICE

DEPARTMENT, and/or Police Officer MARK BASS.

## PARTIES

2.    Plaintiff GABRIEL ISAIAH SANCHEZ ELDRIDGE is a minor, born on June 24, 2005 and

therefore brings this action by and through his guardian ad litem EDDIE SANCHEZ.

Plaintiff GABRIEL ISAIAH SANCHEZ ELDRIDGE is the sole heir of now deceased Eddie

Gabriel Sanchez and is a resident of the County of Santa Clara, State of California.

1

WILCOXEN CALLAHAM, LLP
2114 K Street, Sacramento, California 95816

1       Plaintiff GABRIEL ISAIAH SANCHEZ ELDRIDGE is decedent's beneficiary and

2       successor in interest (as defined in Section 377.11 of the California Code of Civil

3       Procedure) and succeeds to the decedent's interest in any action or proceeding on

4       decedent's behalf. GABRIEL ISAIAH SANCHEZ ELDRIDGE sues as an individual in his

5       own right and, pursuant to the Declaration of EDDIE SANCHEZ, which is attached to

6       this Complaint as Exhibit 1, is the successor in interest, heir and legal representative

7       of decedent to seek redress for the deprivation of decedent's rights, including but not

8       limited to decedent's rights under the United States Constitution, California

9       Constitution and state law.  Plaintiff GABRIEL ISAIAH SANCHEZ ELDRIDGE is

10      informed and believes that no other person has a superior right to commence an

11      action or proceeding on decedent's behalf.

3.      Defendant CITY OF CHICO is a municipal entity, organized under the laws of the state

       of California, and owns, operates, manages, directs and controls the CHICO POLICE

       DEPARTMENT, which employs the other named defendant in this action.

4.      Defendant MARK BASS (hereafter "Defendant BASS") is and at all times mentioned

       herein was an adult over eighteen years old, a resident of the State of California and a

       police officer with the CHICO POLICE DEPARTMENT, and at all times mentioned

       herein was acting in the course and scope of his employment, and under color of state

       law.  Defendant BASS is sued herein in his individual capacity, and as an agent of the

       CHICO POLICE DEPARTMENT.

5.      The true names and capacities -- whether individual, corporate, associate or

       otherwise -- of Defendants DOES 1 through 100, are unknown to Plaintiffs, who

       therefore sue such DOES by such fictitious names. Plaintiffs will amend this

       Complaint to show their true names and capacities when the same have been

       ascertained. Each of the Defendants, and DOES 1 through 100, are legally responsible

       in some manner, negligently, intentionally, strictly, or otherwise for the incident and

       damages that are the subject of this Complaint.

6.      Plaintiff is informed and believes and thereon alleges that at all times herein

       mentioned, each of the Defendants was an agent (either actual and/or ostensible),

WILCOXEN CALLAHAM, LLP
2114 K Street, Sacramento, California 95816

2

1  employee, joint venturer or otherwise related to its co-defendants, and each of them,

2  such that under the laws of the State of California is responsible for the acts and

3  omissions of its co-defendants, and each of them. Plaintiff is further informed and

4  believes and thereon alleges that in doing and failing to do those things herein alleged,

5  each Defendant was acting within the course and scope of said agency, employment,

6  joint venture or other relationship and with the full knowledge, consent, acquiescence

7  and ratification of its co-defendants.

8  <u>**GENERAL ALLEGATIONS**</u>

9  7.    On November 10, 2015, CHICO POLICE DEPARTMENT defendant BASS and Officer

10  David Bailey were attempting to arrest Eddie Gabriel Sanchez, age 34, pursuant to an

11  arrest warrant issued on November 10, 2015, at or about the location of 630 Pomona

12  Avenue, Chico, California. Decedent, Eddie Gabriel Sanchez (hereafter EGS), was a

13  suspect in two robberies which had occurred in Chico, wherein a semi-automatic

14  handgun was allegedly used.

15  8.    Following the showing of the surveillance video of the robbery on television, Mary

16  Romero, the mother of EGS, believed she recognized the suspect and reported to the

17  CHICO POLICE DEPARTMENT that she believed it was her son. Mary Romero and

18  EGS's brother, Daniel Sanchez, told the police that EGS lived at 630 Pomona Avenue,

19  Chico, California. This report was made by the family to stop her son from engaging in

20  illegal acts and to protect him from being killed by the police.

21  9.    Defenadnt BASS and Officer David Bailey drove to 630 Pomona Avenue, Chico,

22  California and encountered the suspect EGS at said location at approximately 1:30

23  p.m. on November 10, 2015. Defendant BASS and OfficerDavid Bailey observed EGS

24  walking away from said location with a female person. During this encounter, three

25  shots were fired by defendant BASS from his Glock Model 21 Semi-Automatic 45

26  caliber pistol, two of which struck EGS in the face, resulting in his death sometime

27  thereafter.

28

WILCOXEN CALLAHAM, LLP
2114 K Street, Sacramento, California 95816

3

WILCOXEN CALLAHAM, LLP
2114 K Street, Sacramento, California 95816

10.    At autopsy, projectiles recovered from the decedent EGS were later found to be consistent with being fired by defendant BASS' Glock Model 21 Semi-Automatic 45 caliber pistol.  Said rounds were hollow point rounds.

11.    Immediately prior to being shot and killed by defendant BASS, decedent EGS was walking with witness Keiana Haas.  Witness Keiana Haas observed the entire incident.  A statement was taken from witness Keiana Haas which was recorded and videoed by the CHICO POLICE DEPARTMENT.  Said statement is in the custody of the CHICO POLICE DEPARTMENT at this time.  Contained in said statement, witness Keiana Haas testified the decedent did not have a gun in his hand when he was shot, but she observed the police officers remove a pistol from the waistband of decedent EGS after he was shot.  Defendants allege that decedent EGS was attempting to run away from defendant BASS and Officer Bailey at the time he was shot in the face by defendant BASS.

12.    Witness Haas' statement and the autopsy confirms decedent was shot in the face at a distance of approximately 10 feet from the officers, with no gun in his hand.

13.    Witness Savannah Rose Lang, was statementized by police agencies on two occasions.  On both occasions, she testified there was no gun in decedent EGS's hand.  In the first statement, witness Lang testified that defendant had his hands up in the air when he was shot.  She stated in her subsequent statement that he may have had his hands in front of him to break his fall, but nonetheless, was not holding a gun, or anything else, in his hand.

14.    Decedent EGS was the father of Plaintiff, GABRIEL ISAIAH SANCHEZ ELDRIDGE, age 10, whose date of birth is June 24, 2005, the natural child and legal heir of Eddie Gabriel Sanchez.

15.    Defendant BASS, by engaging in the conduct described hereinabove, in the absence of an objective threat by the decedent EGS, constituted conduct which was more than ordinary negligence, in that he was acting either intentionally, recklessly or grossly negligently, and acted in violation of the decedent EGS's constitutional rights under

4

00135550                              **COMPLAINT FOR DAMAGES**

WILCOXEN CALLAHAM, LLP
2114 K Street, Sacramento, California 95816

1   the United States Constitution, and similar or analogous provisions of the California

2   Constitution and state laws.

3   16.   Defendant BASS breached general law enforcement and constitutional standards of

4   conduct by intentionally and/or negligently using deadly force in an unjustified

5   situation.  Said conduct also constituted negligent and/or grossly negligent and/or the

6   intentional wrongful death of decedent EGS.

7   17.   Defendant CITY OF CHICO, by and through the CHICO POLICE DEPARTMENT and its

8   Police Chief and other supervisors had an obligation to select and train and retain

9   mentally stable officers.

10  18.   It is alleged on information and belief that the CITY OF CHICO and/or the CHICO

11  POLICE DEPARTMENT and/or Defendant BASS' superiors knew Defendant BASS had

12  past complaints of grossly improper conduct, which established he was unfit to be a

13  police officer.

14  19.   It is alleged on information and belief that complaints, which were repressed and/or

15  ignored by the CHICO POLICE DEPARTMENT, establish that Defendant BASS lacked

16  mental stability and training to safely perform the duties of a police officer, including

17  but not limited to arrests, safety, the use of weapons, generally and with deadly force,

18  at the time of the events set forth herein.

19  20.   It is alleged on information and belief that Defendant BASS received inappropriate

20  psychological evaluations and screenings, was inappropriately supervised and/or

21  disciplined based on his known past conduct, thereby causing the conduct that

22  resulted  in the death of EGS.

23  21.   On or about May 6, 2016 and May 10, 2016, a government claim and amended government

24  claim, respectively, were timely presented by Plaintiff pursuant to the California

25  Government Code to the CITY OF CHICO, copies of which are attached as Exhibit 2.

26  22.   On or about June 20, 2016, said government claims were rejected by the CITY OF CHICO.

27  Copies of the notice of rejection are attached as Exhibit 3.

28  ///

///

5

**FIRST CAUSE OF ACTION**

**(ASSAULT)**

23.   Plaintiff incorporates paragraphs 1 through 22 above, as though fully set forth herein.

24.   This cause of action arises under the general laws and Constitution of the State of California. Plaintiff has complied with the California Tort Claims Act requirements.

25.   As described in detail herein above, Defendant BASS assaulted decedent by acting in a manner so as to place him in reasonable apprehension of immediate harmful or offensive contact by physically threatening and shooting him, thereby causing decedent's death.

26.   DEFENDANTS CITY OF CHICO and/or CHICO POLICE DEPARTMENT, are liable to Plaintiff for the acts of their public employees, the individual Defendant herein, for conduct and/or omissions herein alleged, pursuant to the doctrine of Respondeat Superior, codified at California Government Code § 815 .2.

27.   The aforementioned acts and/or omissions of Defendant BASS were malicious, reckless, and/or intentional, and/or accomplished with a conscious disregard of the respective rights of Plaintiff thereby entitling said Plaintiff to an award of exemplary and punitive damages according to proof.

WHEREFORE, plaintiff prays for judgment against the defendants, and each of them, as hereinafter set forth.

**SECOND CAUSE OF ACTION**

**(WRONGFUL DEATH)**

28.   Plaintiff incorporates paragraphs 1 through 27 above, as though fully set forth herein.

29.   This cause of action arises under the general laws and Constitution of the State of California and is brought pursuant to California Code of Civil Procedure §377.10 et. seq. Section 377.60 specifically states, "[a] cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by any of the following persons or by the decedent's personal representative on their behalf: ( a) ... the persons ... who would be entitled to the property of the decedent by intestate

WILCOXEN CALLAHAM, LLP
2114 K Street, Sacramento, California 95816

6

WILCOXEN CALLAHAM, LLP
2114 K Street, Sacramento, California 95816

1  succession." Per California Probate Code, that person is the decedent's child, Plaintiff
2  herein.

3  30.  After being shot by defendant BASS, EGS survived for a period of time and defendant
4  BASS, and/or Officer Bailey and each of them, performed CPR on EGS, who
5  subsequently died without a spouse and only one surviving issue.

6  31.  The civil rights violations alleged below under 42 U.S.C. §1983, as well as Defendants'
7  other tortious acts and omissions, and negligence under California Civil Code § 1714,
8  form the basis for this cause of action.

9  32.  The Defendants are responsible for the wrongful death of decedent EGS because of
10  their deliberate, reckless, and/or negligent acts and omissions as alleged herein

11  33.  As a direct, legal and proximate result of said conduct of Defendants, and each of
12  them, as previously alleged, Plaintiff sustained damages for the loss of love,
13  companionship, comfort, affection, society, solace and moral support.

14  34.  The aforementioned acts and/or omissions of Defendant BASS were malicious,
15  reckless, and/or intentional, and/or accomplished with a conscious disregard of the
16  respective rights of Plaintiff thereby entitling said Plaintiff to an award of exemplary
17  and punitive damages according to proof.

18  35.  Entity and/or agency Defendants are liable to Plaintiff for the acts of their public
19  employees, the individual Defendant herein, for conduct and/or omissions herein
20  alleged, pursuant to the doctrine of Respondeat Superior, codified at California
21  Government Code § 815.2.

22  WHEREFORE, plaintiff prays for judgment against the defendants, and each of them,
23  as hereinafter set forth.

24  ### THIRD CAUSE OF ACTION

25  ### (VIOLATION 14th AMENDMENT - EXCESSIVE FORCE)

26  36.  Plaintiff incorporates paragraphs 1 through 35 above, as though fully set forth herein.

27  37.  This cause of action arises under United States Code, Title 42, Section 1983, wherein
28  Plaintiff seeks to redress a deprivation under color of law of a right, privilege or

7

1    immunity secured to EGS by the Fourth, and Fourteenth Amendments to the United

2    States Constitution.

3    38.    The use of excessive force upon EGS by Defendant BASS, and defendants and each of

4          them, was without probable cause, or warrant, or any recognized exceptions thereto,

5          and was thus unreasonable, and in violation of EGS's Fourth Amendment right to be

6          free of unreasonable search and seizure and/or excessive force.

7    39.    As a proximate result of the violation of decedent EGS' rights under the Fourth and

8          Fourteenth Amendment to the United States Constitution, as set forth herein, Plaintiff

9          has suffered injuries and damages as alleged herein.

10   40.    The aforementioned acts and/or omissions of Defendant BASS were malicious,

11         reckless, and/or intentional, and/or accomplished with a conscious disregard of the

12         respective rights of Plaintiff thereby entitling said Plaintiff to an award of exemplary

13         and punitive damages according to proof.

14         WHEREFORE, plaintiff prays for judgment against the defendants, and each of them,

15   as hereinafter set forth.

16                          **FOURTH CAUSE OF ACTION**

17   **(42 U.S.C. § 1983 - UNCONSTITUTIONAL POLICY CUSTOM OR PROCEDURE - (*MONELL v.***

18                      ***DEPT. OF SOC. SERVS.*))**

19   41.    Plaintiff incorporates paragraphs 1 through 40 above, as though fully set forth herein.

20   42.    This cause of action arises under United States Code, Title 42, Section 1983, wherein

21         Plaintiff seeks to redress a deprivation under color of law of a right privilege or

22         immunity secured to them, respectively, by the Fourth and Fourteenth Amendments

23         to the United States Constitution.

24   43.    Defendant CITY OF CHICO and/or CHICO POLICE DEPARTMENT violated Plaintiff's

25         constitutional rights, as alleged herein above, by creating and maintaining, among

26         other things, the unconstitutional customs and practices described herein.

27   44.    Plaintiff is informed, believes and thereupon alleges that Defendant CITY OF CHICO

28         and/or CHICO POLICE DEPARTMENT, maintains a custom, policy and/or practice of

WILCOXEN CALLAHAM, LLP
2114 K Street, Sacramento, California 95816

8

1   not properly supervising and/or disciplining their respective employees, officers,

2   managers and supervisors for failing to observe and/or act in compliance with the

3   legal requirements and protections applicable to persons as set forth in the U.S. and

4   California Constitutions, and other laws as set forth in this complaint, including but

5   not limited to 42 U.S.C. §1983 and the Fourth and Fourteenth Amendments to the U.S.

6   Constitution.

7   45.   Plaintiff specifically alleges that Defendants CITY OF CHICO and/or CHICO POLICE

8   DEPARTMENT'S, policy, custom and/or practices, as described herein, were within

9   the control of Defendant CITY OF CHICO and within the feasibility of Defendant CITY

10   OF CHICO to alter, adjust and/or correct so as to prevent some or all of the unlawful

11   acts and injury complained of herein by Plaintiffs.

12   46.   As a proximate result of the violation of decedent EGS' rights under the Fourth and

13   Fourteenth Amendment to the United States Constitution, as set forth herein, Plaintiff

14   has suffered injuries and damages as alleged herein.

15   WHEREFORE, plaintiff prays for judgment against the defendants, and each of them,

16   as hereinafter set forth.

17   ### FIFTH CAUSE OF ACTION

18   ### (42 U.S.C. § 1983 - FAILURE TO TRAIN - *CITY OF CANTON v. HARRIS*)

19   47.   Plaintiff incorporates paragraphs 1 through 46 above, as though fully set forth herein.

20   48.   This cause of action arises under United States Code, Title 42, Section 1983, wherein

21   Plaintiff seeks to redress a deprivation under color of law of a right, privilege or

22   immunity secured to them, respectively, by the Fourth and Fourteenth Amendments

23   to the United States Constitution.

24   49.   Defendants violated Plaintiff's constitutional rights, as alleged herein above, by,

25   among other things, failing to train their officers.

26   50.   Plaintiff is informed, believes and thereupon alleges that Defendants CITY OF CHICO

27   and/or CHICO POLICE DEPARTMENTS, have failed to properly train their respective

28   employees, officers, managers and supervisors as to the legal requirements and

9

WILCOXEN CALLAHAM, LLP
2114 K Street, Sacramento, California 95816

1    protections applicable to persons as set forth in the U.S. and California Constitutions,

2    and other laws as set forth in this complaint, including but not 42 U.S.C. § 1983 and

3    the Fourth and Fourteenth Amendments to the U.S. Constitution.

4    51.  Plaintiff specifically alleges that Defendant CITY OF CHICO and/or CHICO POLICE

5    DEPARTMENT'S failures to train, as described herein, were within the control of

6    Defendants CITY OF CHICO, and within the feasibility of Defendant CITY OF CHICO, to

7    alter, adjust and/or correct so as to prevent some or all of the unlawful acts and injury

8    complained of herein by Plaintiff.

9    52.  As a proximate result of the violation of decedent EGS' rights under the Fourth and

10   Fourteenth Amendment to the United States Constitution, as set forth herein, Plaintiff

11   has suffered injuries and damages as alleged herein.

12   WHEREFORE, plaintiff prays for judgment against the defendants, and each of them,

13   as hereinafter set forth.

14   ## SIXTH CAUSE OF ACTION

15   ### (42 U.S.C. § 1983 - LOSS OF PARENT/CHILD RELATIONSHIP)

16   53.  Plaintiff incorporates paragraphs 1 through 52 above, as though fully set forth herein.

17   54.  This cause of action arises under United States Code, Title 42, Section 1983, wherein

18   Plaintiff seeks to redress a deprivation under color of law of a right, privilege or

19   immunity secured to them, respectively, by the Fourth and Fourteenth Amendments

20   to the United States Constitution.

21   55.  Defendants violated Plaintiff's constitutional rights, as alleged herein above, by,

22   among other things, their failure to train, supervise, and/or take other measures to

23   prevent the conduct in the incidents giving rise to this matter and caused the untimely

24   and wrongful death of decedent EGS, and deprived Plaintiff of their respective

25   interests in the parent-child relationship in violation of their respective substantive

26   due process rights as defined by the Fourteenth Amendment to the United States

27   Constitution.

28

WILCOXEN CALLAHAM, LLP
2114 K Street, Sacramento, California 95816

10

00135550                                    **COMPLAINT FOR DAMAGES**

56.    As a proximate result of the violation of decedent EGS' rights under the United States Constitution, including the Fourth and Fourteenth Amendments to the United States Constitution, as set forth herein, Plaintiff has suffered injuries and damages as alleged herein.

57.    The aforementioned acts and/or omissions of Defendant BASS was malicious, reckless and/or accomplished with a conscious disregard of the respective rights of Plaintiff thereby entitling said Plaintiff to an award of exemplary and punitive damages according to proof.

WHEREFORE, plaintiff prays for judgment against the defendants, and each of them, as hereinafter set forth.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1.    For trial by jury;

2.    For compensatory damages, including general and special damages, jointly and severally, in an amount according to proof;

3.    For punitive damages pursuant in an amount sufficient to deter and make an example of each non-governmental entity Defendant;

4.    For statutory damages, according to proof;

5.    For reasonable attorney fees pursuant to 42 U.S.C. § 1988;

6.    For prejudgment interest according to proof;

7.    For costs of suit; and

8.    For such further relief which is just and proper.

Dated: September 28, 2016.                    **WILCOXEN CALLAHAM, LLP**

By: _____
    DANIEL E. WILCOXEN
    DREW M. WIDDERS
    Attorneys for Plaintiff

WILCOXEN CALLAHAM, LLP
2114 K Street, Sacramento, California 95816

11



FSC
www.fsc.org
MIX
Paper from
responsᵎ ᵎrces
FSC®      ᵎ18

KLEER-FAX   80000 SERIES • 30% P.C.W.
RECYCLED®   www.kleer-fax.com

**WILCOXEN CALLAHAM, LLP**
DANIEL E. WILCOXEN, SBN 054805
DREW M. WIDDERS, SBN 245439
2114 K Street
Sacramento, California 95816
Telephone: (916) 442-2777
Facsimile: (916) 442-4118
email: dwilcoxen@wilcoxenlaw.com
email: dwidders@wilcoxenlaw.com

### IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

### IN AND FOR THE COUNTY OF BUTTE

| | |
|---|---|
| GABRIEL ISAIAH SANCHEZ ELDRIDGE by and through his guardian ad litem, EDDIE SANCHEZ, | **CASE NO.:** |
| Plaintiff, | **DECLARATION PURSUANT TO CCP §377.32** |
| -vs- | |
| CITY OF CHICO, CHICO POLICE DEPARTMENT, MARK BASS and DOES 1 through 100, inclusive, | |
| Defendants. | |

I, EDDIE SANCHEZ, declare as follows:

1.    Decedent's name was EDDIE GABRIEL SANCHEZ.

2.    EDDIE GABRIEL SANCHEZ died on November 10, 2016, in Butte County, California.

3.    There is no proceeding now pending in California for administration of Decedent's estate.

4.    The undersigned is the paternal grandfather, and Guardian ad Litem, for plaintiff, GABRIEL ISAIAH SANCHEZ ELDRDIGE, a minor.

5.    GABRIEL ISAIAH SANCHEZ ELDRIDGE is decedent's successor in interest (as defined in Section 377.11 of the California Code of Civil Procedure) and succeeds to the decedent's interest in the action or proceeding.

1

6.     No other person has a superior right to commence the action or proceeding or to be substituted for the decedent in the pending action or proceeding.

7.     Attached hereto is a true and correct copy of decedent's death certificate.

I declare under penalty of perjury that the foregoing is true and correct.   Executed this __ day of September, 2016, at Paradise, California.

_____
EDDIE SANCHEZ

WILCOXEN CALLAHAM, LLP
2114 K Street, Sacramento, California 95816

2



FSC
www.fsc.org
MIX
Paper from
respon.     ~·1rces
FSC⁹·    ·618

80000 SERIES • 30% P.C.W.
www.kleer-fax.com



**FIRST AMENDED**
# CLAIM FOR MONEY OR DAMAGES AGAINST THE CITY OF CHICO

Before completing this form, please read the "Instructions for Filing A Claim."

File With: City of Chico City Clerk's Office
Hand Delivery: 411 Main Street, Third Floor
Mailing Address: P.O. Box 3420, Chico, CA 95927-3420

| Official Use Only |
| --- |
| Claim #: ~~DR4476~~ **RECEIVED** |
| **MAY 1 0 2016** |
| CITY CLERK CITY OF CHICO |

| SECTION 1: CLAIMANT INFORMATION | |
| --- | --- |
| Name of Claimant<br>GABRIEL ISAIAH SANCHEZ ELDRIDGE | Telephone Number (including area code)<br>(831) 794-1736 |

| Mailing Address |
| --- |
| 2278 LUCRETIA AVENUE, APT. 4 |

| City<br>SAN JOSE | State<br>CA | Zip<br>95122 |
| --- | --- | --- |

| Claimant(s) Date(s) of Birth<br>JUNE 24, 2005 | Social Security Number<br>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 | Driver License Number<br>N/A | Gender<br>■ Male  ☐ Female |
| --- | --- | --- | --- |

| Name Of Person/Insurance Company/Attorney To Which Notices Should Be Sent, If Different Than Claimant |
| --- |
| DANIEL E. WILCOXEN, WILCOXEN CALLAHAM, LLP |

| Address To Which Notices Should Be Sent, If Different<br>2114 K STREET | City<br>SACRAMENTO | State<br>CA | Zip<br>95816 |
| --- | --- | --- | --- |

| SECTION 2: CLAIM INFORMATION |
| --- |

| Type of Claim |
| --- |
| ☐ Property Damage   ☐ Personal Injury   ■ Other. Explain:   SEE ATTACHMENT |

| Dollar Amount of Claim* | *If your claim amount exceeds $10,000, no dollar amount is to be listed. However, you must indicate whether the claim would be limited or unlimited civil case.<br>☐ Limited Civil Claim ($10,000 - $24,999)   ■ Unlimited Civil Claim ($25,000 or more) |
| --- | --- |

| How Was The Claim Amount Computed? (Attach All Supporting Documentation) |
| --- |
| SEE ATTACHMENT |

| Date of Incident<br>11/10/15 | Time of Incident<br>APX. 1:30 PM   AM / PM | If you are filing this claim more than six months beyond the date of incident, please see instructions for filing a Late Claim Application. |
| --- | --- | --- |

| Location of Incident |
| --- |
| 630 POMONA AVENUE, CHICO, CA |

| Name of Employee(S) and/or City Department Believed to Be Involved<br>SEE ATTACHMENT | Police Department Report No.<br>15-7829 |
| --- | --- |

| Describe the specific damage or injury incurred as a result of the incident. (Attach additional sheets as necessary) |
| --- |
| SEE ATTACHMENT |

| Describe the circumstance that led to the alleged damage or injury. State all the facts that support your claim against the City of Chico, and why you believe the City is responsible for the alleged damage or injury. (Attach additional sheets as necessary) |
| --- |
| SEE ATTACHMENT |

## SECTION 3: WITNESS INFORMATION

| 1. Name of Witness SEE ATTACHMENT | Address | Telephone Number |
|---|---|---|
| 2. Name of Witness | Address | Telephone Number |
| 3. Name of Witness | Address | Telephone Number |

## SECTION 4: AUTO INSURANCE INFORMATION

Has a Claim for Alleged Damage/Injury Been Filed or Will be Filed With your Insurance Company?

■ No  ❑ Yes

| Name of Insurance Company | Broker/Agent Name |
|---|---|

| Insurance Company Mailing Address | City | State | Zip |
|---|---|---|---|

| Type of Insurance | Policy Number | Limits of Insurance and Deductible |
|---|---|---|

| Vehicle Make | Model | Year |
|---|---|---|

Vehicle Registered Owner

## SECTION 5: MEDICAL CARE INFORMATION

| Have You Sought Medical Treatment Related to Your Claim? ■ No  ❑ Yes | Was Any Part of the Treatment Costs Covered by Medicare or SSDI? ■ No  ❑ Yes |
|---|---|

| Name of Doctor/Hospital Providing Treatment | Attending Physician |
|---|---|

| Address | City | State | Zip |
|---|---|---|---|

| Telephone Number (including area code) | Treatment Date(s) |
|---|---|

## SECTION 6: NOTICE AND SIGNATURE

If applicable, please attach any repair bills, estimates or similar documents supporting your claim.

The complete claim form along with one copy of all related documents must be filed with the City of Chico City Clerk's Office. The City Clerk's Office is the ONLY office to which claims may be submitted. Claims sent to any other department will be not considered valid formal claims, and will not be responded to. You may not receive any further notice.

A claim for money or damages against the City of Chico pursuant to the California Tort Claims Act (Gov. Code §810 et seq.) shall be filed by the claimant or a person acting on his or her behalf using this form only (G.C. §910.4) and shall include the information requested below. (If additional space is needed, please attach a separate sheet, identifying the paragraph being answered.)

Warning: Presentation of a false claim is a felony (Penal Code §72). Penal Code states, "Every person who, with intent to defraud, presents for allowance or for payment to any state board or officer, or to any county, city, or district board or officer, authorized to allow or pay the same if genuine, any false or fraudulent claim, bill, account, voucher, or writing, is punishable either by imprisonment in the county jail for a period of not more than one year, by a fine of not exceeding one thousand dollars ($1,000), or by both that imprisonment and fine, or by imprisonment pursuant to subdivision (h) of Section 1170, by a fine of not exceeding ten thousand dollars ($10,000), or by both such imprisonment and fine." Pursuant to Code of Civil Procedure §1038, the City may seek to recover from you all costs of defense in the event an action is filed which is later determined not to have been brought in good faith and with reasonable cause.

You or your representative are required to sign this form (G.C. §910.2).

| Signature | Date 05/09/16 |
|---|---|

## ATTACHMENT TO CLAIM FOR MONEY OR DAMAGES
## AGAINST THE CITY OF CHICO

SECTION 2  CLAIM  INFORMATION

TYPE OF CLAIM:

The conduct of the Chico Police Department, Officer Mark Bass, Officer Mark Bass' supervisors, including the Chief of the Chico Police Department and the City of Chico, include but are not limited to:

Civil assault;
Civil battery;
Negligence;
Gross negligence;
Recklessness;
Civil rights violations including federal constitution claims actionable under 42 U.S.C. 1983 and California constitutional claims;
Wrongful death;
Punitive damages against Officer Mark Bass.

HOW WAS THE CLAIM AMOUNT COMPUTED?

Wrongful death case, damages include the loss of love, comfort, companionship and support and the value of the case is in excess of $10,000.

DESCRIPTION OF THE INDEBTEDNESS OBLIGATION INJURY DAMAGE OR LOSS INCURRED AS FAR AS KNOWN TO THE CLAIMANT HEREIN:

As a result of the acts and omissions described hereinabove, Eddie Gabriel Sanchez was killed at approximately 1:30 p.m. on November 10, 2015.

As a result of his death, his heir has sustained general damages in an amount to be determined, as well as other incidental damages.

NAME OF THE PUBLIC EMPLOYEE WHO CAUSED THE INJURY:

Chico Police Department;
Officer Mark Bass;
Officer Bass' supervisors, including the Chief of the Chico Police Department;
City of Chico.

00129565

Page 1 of 4

DESCRIBE THE SPECIFIC DAMAGE OR INJURY INCURRED AS A RESULT OF THE
INCIDENT:

Based on the facts and circumstances set forth hereinabove, Claimant seeks and is entitled
to recover exemplary and punitive damages against Officer Mark Bass, and general and special
damages against the Chico Police Department, the City of Chico, and/or any other supervisory
and/or employees against whom liability is proven.

On November 10, 2015, Chico Police Department officers Mark Bass and David Bailey
were attempting to arrest Eddie Gabriel Sanchez, age 34, pursuant to an arrest warrant issued on
November 10, 2015, at or about the location of 630 Pomona Avenue, Chico, California.
Decedent, Eddie Gabriel Sanchez (hereafter EGS), was a suspect in two robberies which had
occurred in the City of Chico, wherein a semi-automatic handgun was allegedly used.

In that surveillance video of the robbery was available and shown on television, Mary
Romero, the mother of EGS, recognized the suspect and reported to the Chico Police Department
that she believed it was her son. Mary Romero and EGS's brother, Daniel Sanchez, told the
police that EGS lived at 630 Pomona Avenue, Chico, California. This report was made by the
family to stop her son from engaging in this action and to protect him from being killed by the
police.

Officers Mark Bass and David Bailey encountered the suspect EGS at the above location
at approximately 1:30 p.m. on November 10, 2015. At this encounter, three shots were fired by
Officer Bass' pistol, two of which struck EGS in the head, resulting in his death. Officer Bass'
pistol, a Glock Model 21 Semi-Automatic 45 caliber pistol was fired three times and two rounds
struck EGS in the face as set forth hereinabove.

At autopsy, projectiles recovered from the decedent EGS were later found to be consistent
with being fired by Officer Bass' above-described Glock Model 21 Semi-Automatic 45 caliber
pistol. Said rounds were hollow point rounds.

Immediately prior to being shot and killed by Officer Mark Bass, decedent EGS was
walking with witness Keiana Haas, whose address is 223 Harrison Street, Etna, California.
Witness Keiana Haas observed the entire incident. A statement was taken from witness Keiana
Haas which was recorded and videoed by the Chico Police Department. Said statement is in the
custody of the Chico Police Department at this time, and a typed partial transcript is attached
hereto as Exhibit A. Contained in said statement, witness Keiana Haas testified the decedent did
not have a gun in his hand when he was shot, but she observed the police officers remove a pistol
from the waistband of decedent EGS after he was shot. Allegedly, decedent EGS was attempting
to run away from officers Bass and Bailey at the time he was shot. However, witness Haas'
statement and the autopsy indicates he was shot in the face at a distance of approximately 10 feet
from the officers, with no gun in his hand.

00129565                                    Page 2 of 4

Witness Savannah Rose Lang, whose address is 621 Pomona Avenue, Apt. 5, Chico, California, was statementized by police agencies on two occasions. On both occasions, she testified there was no gun in decedent EGS's hand. In the first statement, witness Lang testified that defendant had his hands up in the air when he was shot, and she stated in her subsequent statement that he may have had his hands in front of him to break his fall, but nonetheless was not holding a gun, or anything else, in his hand. See Exhibit B.

Decedent EGS was the father of Claimant Gabirel Isaiah Sanchez Eldridge, age 10, whose date of birth is June 24, 2005 and is currently living with his mother, Amanda Marie Eldridge, at 2278 Lucretia Avenue, Apt. 4, San Jose, California 95122.

Officer Mark Bass, by engaging in the conduct described hereinabove, in the absence of an objective threat by the decedent EGS, constituted conduct which was more than ordinary negligence, in that he was acting either intentionally, recklessly or grossly negligently, and acted in violation of the decedent EGS's constitutional rights under the 4th, 5th, 8th and 14th Amendments to the United States Constitution, and similar or analogous provisions of the California Constitution.

Officer Mark Bass breached general law enforcement and constitutional standards of conduct by using deadly force in an unjustified situation. Said conduct also constituted negligent and/or intentional wrongful death of decedent EGS. Chico Police Department and its Police Chief and other supervisors had an obligation to select and train and retain mentally stable officers. Officer Bass' past conduct confirms that the Chico Police Department and Officer Bass' superiors knew he had past complaints of grossly improper conduct, establishing he was unfit to be a police officer. Complaints, which were repressed by the police department, establish that Officer Bass lacked adequate mental stability and training with regard to arrests, safety, the use of weapons, generally and with deadly force, at the time of the events set forth herein. Thus, at the time of his conduct during the events described herein occurred, he was unfit and negligently retained by the Chico Police Department, his supervisors and superiors. Acting under color of law, the Chico Police Department, its Chief, and Officer Bass' supervisors, lacked and failed to implement and enforce appropriate and adequate policies and procedures to prevent the events which occurred in this instance.

Officer Bass received inappropriate psychological evaluations and screenings, was inappropriately supervised and/or disciplined based on his known past conduct, resulting in the death of EGS. The allowance of Officer Bass to continue as an armed police officer by the Chico Police Department, created an obvious danger that he would inflict an unconstitutional injury or death upon citizens, including the decedent, EGS. The failure to provide and ensure that the police officers of the Chico Police Department received appropriate training and followed said training, or be removed from their ranks as unstable and dangerous officers, shows a reckless and grossly negligent and/or deliberate indifference to the constitutional rights of citizens such as Eddie Gabriel Sanchez, and the public at large.

EGS was killed by Officer Bass while he was on duty, acting under the color of law, within the apparent scope and authority of his position as a police officer. The death of decedent EGS and damages to his heir were a foreseeable result of the Chico Police Department's knowledge of the inadequacies and bizarre behavior and failures of Officer Bass prior to the event causing the death of Eddie Gabriel Sanchez, and was an actual and proximate cause of EGS's death. Officer Bass and his supervisors and the Chico Police Department thereby violated the state and federally guaranteed civil rights of EGS and his heir, Gabriel Isaiah Sanchez Eldridge. The conduct of Officer Bass, including the unreasonable shooting and resultant death of the unarmed suspect amounted to unlawful seizure under the 4th, 5th, 8th, and 14th Amendments of the United States Constitution, and is actionable under 42 U.S.C. 1983 by the heir of EGS. It also constituted a depravation of the constitutional rights of EGS and his heir to substantive procedural due process under the 4th, 5th, 8th, and 14th Amendments of the United States Constitution, and provisions of the California Constitution.

DESCRIBE THE CIRCUMSTANCES THAT LED TO THE ALLEGED DAMAGE OR INJURY. STATE ALL THE FACTS THAT SUPPORT YOUR CLAIM AGAINST THE CITY OF CHICO, AND WHY YOU BELIEVE THE CITY IS RESPONSIBLE FOR THE ALLEGED DAMAGE OR INJURY.

See above.

SECTION 3: WITNESS INFORMATION

| | Name of Witness | Address | Telephone No. |
|---|---|---|---|
| 1. | Officer Mark Bass | Chico Police Department | Unknown |
| 2. | Officer David Bailey | Chico Police Department | Unknown |
| 3. | Keiana Haas | 223 Harrison Street, Etna, CA | Unknown |
| 4. | Savannah Rose Lang | 621 Avenue, Apt. 5, Chico, CA | Unknown |

# EXHIBIT A

11/13/2015 FRI 15:18  FAX 530+538+2099  →→→ CHICO PD                                    Ø003/017



| **BUTTE COUNTY SHERIFF'S OFFICE**<br>33 COUNTY CENTER DRIVE, OROVILLE, CA 95965  (530) 538-7321<br>CA0040000                    FAX (530) 538-2099 | **CRIME<br>INCIDENT<br>REPORT**<br>Page 2 of 8 | CASE: 015-1369<br>CONNECTED: |

Narrative

Source/Probable Cause:
On 11/10/15 at approximately 1400 hours, I was instructed to go to the Chico Fire Training Center. I was informed that officers from the Chico Police Department had been involved in an Officer Involved Shooting (OIS) and that the county wide shooting protocol team was being activated.

Arrival/Investigation.
At approximately 1830 hours, Det. Freeman, Det. Calkins and I were assigned to speak to four individuals who had been removed from the home at 630 Pomona Av. Det. Freeman, Det. Calkins and I were informed that the four individuals were potential witnesses to the shooting, especially a female detainee (Keiana Haas) who was walking wit the decedent at the time of the shooting. Det. Freeman, Det. Calkins and I were tasked with getting statements from ti four individuals.

**Keiana Haas (04/04/96):**
Det. Freeman and I conducted the first interview with Keiana Haas. The interview was conducted at the Chico Police Department (CPD) in one of their holding cell interview rooms. The interview was digitally recorded for audio and video. A copy of the interview was later transferred to DVD and booked into evidence at the Butte County Sheriff's Office. What follow is a summary of that interview.

'rior to speaking to Hass, Det. Freeman advised Haas of her rights from a standard Miranda card. After each advisement Det. Freeman asked Haas if she understood her right and she indicated that she did. I was present for Det. Freeman's Miranda admonishment of Haas.

Haas said she was 19 years old and the mother of a two year old girl. Haas said she lived in the town of Etna, which was near Yreka in northern California. Haas said she had a friend, identified only as "Karen" (19 years of age), that lived on Pomona Av. Haas said Karen's house was "a few" house east of 630 Pomona Av towards the Pomona West Apartment complex. Haas said she did not know Karen's address, but that the home was on the same side of the road as the Pomona West Apartments. Haas said she lived in Etna, and Karen came to pick her up so she could stay with he in Chico, until 11/18/15. Haas said Karen drove an older blue Honda accord style car. Haas said she came to town on or about Thursday (11/05/15) and she had been staying with Karen.

Haas said just prior to the shooting she was walking around the neighborhood, using her cellular phone looking for free Wi-Fi. Haas said she found a spot near 630 Pomona Av, which had a decent Wi-Fi reception. I asked Haas if she knew any of the people at the house and she said no. Haas said she walked down the driveway "a ways" to access the Wi-Fi.

Det. Freeman asked Haas if she had ever been to that house before and she said no. I told Haas that at some point, something took place. I asked Haas to tell me what took place. Haas said "the guy that got shot", who she did not know, grabbed her hand and said 'hey will you walk me across the street.' Haas said she told "the guy" that she would walk with him.

"The guy" was later identified as Edward Gabriel Sanchez and herein will be referred to as Gabriel. It should be noted at during the first portion of the interview Haas referred to Gabriel as "the guy" or "he", and insisted she didn't know Gabriel. It was not until the second interview Haas admitted knowing Gabriel and began calling him by name. In fact,

Signature/ID#: _____          Reviewed By: _____ AC 5 15

11/13/2015 FRI 15:18  FAX 530+538+2099  --- CHICO PD                                    ☑004/017



| BUTTE COUNTY SHERIFF'S OFFICE | CRIME | CASE C15 1635|
|---|---|---|
| 33 COUNTY CENTER DRIVE, OROVILLE, CA 95965  (530) 538-7321 | INCIDENT REPORT | |
| CA0040000          FAX (530) 538-2099 | Page 3 of 8 | CONNECTED |

Detectives didn't use the name Gabriel until the second part of the interview.  For the purposes of this report, the decedent will be referred to as Gabriel.

Haas said as she and Gabriel got to the other side of the street two guys jumped out of a car.  Haas said one of the guy was wearing a pink button up shirt and a black vest.  Haas said the other guy was wearing a black shirt and a black v Haas said the two males had guns and they told them to stop, at which time Gabriel ran off and they (the police) shot him.  Haas said she stood still and then they told her to lay on the ground, so she did.

After Haas provided her account of the incident, I started from the beginning for additional details.  Haas said she had walked approximately half of the way down the driveway (at 630 Pomona Av) to look for Wi-Fi, to just past the from house, near a log.

I asked Haas if she found it odd, that Gabriel (who she didn't know) would ask her to walk across the street and she said "kinda".  Det. Freeman asked Haas if Gabriel said anything else to her and she said "he told me that he had a gun Haas said Gabriel said 'will you walk me across the street,' and 'I have a gun'.  I asked Haas if she saw the gun and si said no.  I asked Haas why Gabriel would tell her that and she said she didn't know.

Det. Freeman asked Haas if she was frightened by the mention of the gun and she said no.  Haas said Gabriel didn't threaten her with the gun, nor did he seem threatening.  Haas said Gabriel seemed "kinda weird" and he seemed like h wanted someone to walk with him.

Haas said she and Gabriel were on the other side of the street, at the other side walk, when the two officers got out of the silver car.  I asked Haas if she saw the silver car, prior to being contacted and she said no.  I asked Haas what she and Gabriel were talking about she said nothing.  Haas said she and Gabriel were just walking.  Haas said Gabriel grabbed her hand and was pulling her as they walked.  Haas said she pulled her hand away, and he grabbed it again.  Haas said Gabriel was holding her hand, but she felt as though she could leave if need be.

I asked Haas to better describe the two officers.  Haas said one of the males, was an older middle white male with grey hair ar pink shirt and a vest.  The other male was a middle aged white male with a black shirt and vest.  Haas described the vests as being a "cop vest" with white lettering which said "Sheriff" or "Police" on it.  I asked Haas if she identified th lettering and individuals as being law enforcement and she said "ya".  Haas said the silver car was parked in the parking lot to her left and looked as though it was pulling out towards the road.

Haas said the two police officers said "freeze police" and Gabriel ran.  I asked Haas what Gabriel did the second they saw the police.  Haas said "he (Gabriel) just froze, then he ran off."  I asked Haas where Gabriel ran to when he ran an she said "to the right."  I asked Haas if Gabriel stopped and she said no, they shot him.

I asked Haas if she ever saw Gabriel pull the gun out, and she said no.  I asked Haas if Gabriel said anything when he started to run and she said no.  I asked Haas if the police said anything when Gabriel started to run and she said "they said stop."  I asked Haas if Gabriel responded and she said "nope."

I asked Haas if Gabriel was wearing long or short sleeves and she said "short sleeves."  I asked Haas if Gabriel was holding anything in his hands, cell phone, anything and she said "no."  I asked Haas if she saw anything in Gabriel's hands when he started to run and she said no.

asked Haas who shot their gun and she said the man in the pink shirt.  I asked Haas how many times the guy in pink shot and she said twice.  I asked Haas if the other officer shot and she said "I don't think so."  Haas said after the

Signature/ID#: _____            Reviewed By: _____



| **BUTTE COUNTY SHERIFF'S OFFICE**<br>33 COUNTY CENTER DRIVE, OROVILLE, CA 95965  (530) 538-7321<br>CA0040000                                    FAX (530) 538-2099 | **CRIME INCIDENT REPORT**<br>Page 4 of 8 | CASE<br>CONNECTED | CIS-16-391 |
| --- | --- | --- | --- |

officers shot, Gabriel fell and the officers told her to lay down. Haas said she was lying prone on the sidewalk, parall to the street with her head facing towards Gabriel.

Det. Freeman asked Haas how far she and Gabriel were from the police officers when they first contacted them. Haas estimated that she was approximately 10 feet from the police at first contact. Det. Freeman asked Haas how far she thought Gabriel was from their original position, before the officers fired. Haas said not that far, maybe a couple of feet. Haas said as soon as Gabriel turned to run, she heard them shoot. I asked Haas if she thought Gabriel went as far as one corner in the interview room to the other and she said maybe. It should be noted that the interview room was approximately 8'x6', making the diagonal distance approximately 10'. Haas indicated that it could have been less than that.

I asked Haas what happened after Gabriel was down. Haas said the guy in pink seemed in shock. Haas said the guy in pink was telling the other officers "he's got a gun, he's got a gun. Check him, check him." Haas said three officers approached Gabriel cautiously and turned him over.

Haas said the new group of officers rolled Gabriel to his side and located the gun. Haas said she saw the gun and said was a small one. Haas said she thought the gun was in Gabriel's waist band. Haas made a motion towards the right waist band area, over the right hip in the front.

Det. Freeman asked Haas if she saw the officers remove the gun and she said yes. Haas said the officer removed the gun and they threw it to the side. I asked Haas if she was close to Gabriel when the officers rolled him and she said yes. I asked Haas if she was the same distance as the room and she said yes, approximately 10 feet. Haas said the officers turned Gabriel onto his left side, and his belly button was facing Pomona Av. Haas said officers checked to see if Gabriel was breathing and then they started CPR.

Det. Freeman asked Haas if she was sure she saw the Officers remove the gun from Gabriel's waist band or if it was lying on the ground. Haas said "no, he pulled it off of him." Det. Freeman asked Haas if she was sure the officers pulled the gun from Gabriel's waist band and she said yes.

I asked Haas if the officers had to pull the shirt up to expose the gun and she said yes. Det. Freeman asked Haas if the shirt was completely untucked and Haas said yes.

I confirmed with Haas that the officer in pink yelled that Gabriel had a gun, prior to Gabriel being rolled over and she indicated yes. I asked Haas if the officer in pink said Gabriel had a gun prior to her seeing the gun and she said "ya." I asked Haas if the officer said there was a gun prior to Gabriel being rolled over and she said "ya". I asked Haas if the officer said Gabriel had a gun before the other group of officers were even at Gabriel and she said yes.

I asked Haas what the officer in black was doing. Haas said the officer in black was standing to the right of the one in pink, pointing his gun at Gabriel. Haas said the officer in pink seemed in shock, like he had never shot anybody before. Haas said she figured cops shot a lot of people. Det. Freeman and I explained we had never shot anyone and she was surprised. Haas said the officer in pink seemed like he didn't want to have to shoot. I asked Haas if the officer seemed excited or happy that he shot and she said "no." Haas said the officer seemed like he didn't wanna "do it", but he'd thought about it and he did it. Haas said after the officer found the gun, the officer in the pink shirt was pacing around.

I asked Haas about her being handcuffed. Haas said another officer handcuffed her. Haas said the handcuffs were a pretty tight, causing some minor discomfort. Haas said no force was used by the officers. Haas showed me her wrists and I noticed some minor red lines on her wrist. Haas said she did not need any medical attention. Haas said she was

Signature/ID#: _____  Reviewed By: _____ JC  5 15



**BUTTE COUNTY SHERIFF'S OFFICE**
33 COUNTY CENTER DRIVE, OROVILLE, CA 95965   (530) 538-7321
CA0040000                          FAX (530) 538-2099

| CRIME INCIDENT REPORT Page 5 of 8 | CASE C15-16391 |
| CONNECTED | |

searched and transported to the police department. I asked Haas if she was questioned by anyone else and she said no. I asked Haas if she spoke to anyone from the point of "freeze police" up until we spoke to her and she said no. Haas said a female officer asked her name and date of birth, but that was it.

Det. Freeman asked Haas what Gabriel was wearing. Haas said Gabriel was wearing black pants and a fitted shirt. Det. Freeman asked Haas if the shirt was baggy and she said it was pretty fitted and not too baggy.

I asked Haas how Gabriel seemed as they walked towards the road. Haas said Gabriel seemed agitated. I asked Haas Gabriel seemed nervous and she said he seemed like he just wanted to "get away". Haas said "he seemed like he was not himself", that "he seemed like he wanted to go somewhere". Haas insisted that she never met Gabriel and that she had never been to that house before.

Det. Freeman asked Haas if everything we'd discussed was the truth and she said yes. Det. Freeman and I left the room at that point.

Det. Freeman and I spoke to Det. Hass from Chico Police Department. Det. Hass said he spoke to Detectives at the crime scene, who discovered mail and Haas' personal property inside of the house. Det. Hass said detectives found a large stack of mail addressed to Haas and women's underwear at the house inside one of the rooms at the house.

Det. Freeman re-contacted Haas with the new information and she said she had been staying at the house.

I asked Haas how well she knew Gabriel and she said not that well. Haas stated she knew Gabriel as Gabriel and that she had known him for a couple of days. Haas said she had just meet Gabriel. Haas said she just meet Gabriel when she came to town on Thursday. Haas said Karen introduced her to Gabriel after she came to town. Haas said she started staying at 630 Pomona Av on or about Thursday. Haas said Gabriel, Robert "bobby", Rafael and Dewey were all at the house. Haas said Dewey was her daughter's uncle.

Haas said she was actually at the gate, when Gabriel walked up and asked her to walk with him across the street. Det. Freeman asked Haas if she knew Gabriel had the gun prior to him saying anything. Haas said she knew Gabriel had a gun, because she had seen it.

I asked Haas how Gabriel had been during the day. Haas said Gabriel had been fine. I asked Haas if Gabriel had been paranoid that day and she said Gabriel was always paranoid. Haas said when Gabriel saw her sitting outside he seemed "really paranoid."

I bluffed Haas and asked her to tell me about the surveillance cameras. Haas said she didn't think the cameras recorded. Haas said there was a camera that faced the front porch and there was a camera that faced the rear porch.

Haas said that was the first time she had stayed at the house. Det. Freeman asked Haas why she didn't think her staying at the house was important and she said just didn't think it was important. I asked Haas if she and Gabriel were in a dating relationship and she said no.

I asked Haas if she knew Gabriel was dead and she said "ya". It should be noted that Haas did not express any emotion when I told her that Gabriel was dead.

Signature/ID#: _____          Reviewed By: _____ S-15



**BUTTE COUNTY SHERIFF'S OFFICE**
33 COUNTY CENTER DRIVE, OROVILLE, CA 95965  (530) 538-7321
CA0040000                              FAX (530) 538-2099

| CRIME INCIDENT REPORT | CASE: | C15-16391 |
|---|---|---|
| Page 6 of 8 | CORRECTED | |

I asked Haas if she was having a sexual relationship with Gabriel and she said no. I asked Haas if she was having a romantic relationship with anyone in the house and she said "Dewey". I asked Haas if anyone in the house mentioned anything happening over the weekend and she said "not that I know of".

I asked Haas if there was anything different about the story she told before, now that I knew she had been staying at the house and she said "just that I knew him (Gabriel)."

I asked Haas to tell me again, from start to finish, honestly, what happened since she came to town. Haas said she and Dewey came to town with Karen to party and let some stress out. Haas said she woke up in the morning and called her mom to check in.

Haas said she woke up next to Dewey at approximately 1100 hours. Haas said Gabriel was asleep on the couch in the living room and Rafael was asleep in Gabriel's room. Bobby was asleep in his room. I asked Haas to draw me a sketch of the house and the locations of all the individuals inside. After Haas drew the house and room, she labeled the areas where everyone was located. Haas then signed and dated the bottom of the photo. I attached a copy of that sketch to this report and booked the original into evidence at the Sheriff's Office.

Haas said she woke up, milled around the house for some time, went outside, and went back to the bedroom to wake up Dewey. I asked Haas what was going on the night before and she said everyone was partying. Haas said they drank some alcohol and smoked some marijuana. I asked Haas if anyone smoked any methamphetamine and she said no. Haas said Gabriel was the only one that "really did that".

Haas said the morning of the shooting everyone in the house wanted to "get a bottle" (indicating they wanted alcohol), but she wanted to get something to eat. I asked Haas if any of the individuals in the house worked and she said no. Haas said they were on public assistance. Haas said they all had EBT cards.

Det. Freeman asked Haas if she saw anyone go out the back door to use the bathroom, prior to going outside to check for Wi-Fi and she said no.

While with Dewey, she heard Gabriel's mother pounding on the back door to the house yelling to Gabriel. Haas said Gabriel's mother walked around to the front of the house and had a conversation with Gabriel. Haas said Gabriel gave his mother a black duffle bag that he claimed had Christmas gifts for his children.

Haas said Gabriel and his mother had a conversation approximately ten feet away from the front porch. Haas said Gabriel's mother was telling him that she could help him and that he needed to go with her. Haas said Gabriel's mother was crying and seemed very upset and worried. Haas said Gabriel seemed annoyed or bothered by his mother's visit.

Haas said Gabriel went into the house and came out with the bag. Haas demonstrated that the bag was approximately two feet long, with a single zipper and a handle. Haas said the bag was full. Haas said Gabriel's mother was still crying when he gave her the bag.

I asked Haas what Gabriel's demeanor was after his mother left. Haas said Gabriel didn't seem that upset by the visit. Haas said Gabriel went back into the house and was playing on his phone by the front window. Haas said she went outside with Dewey and Rafael. Haas said it was approximately an hour, from when Gabriel's mother left and he came at asking her to walk across the street with him. Haas said nothing regarding the rest of the incident changed.

Signature/ID#: _____  39189        Reviewed By: _____ JC  6-15

11/13/2015 FRI 15:20  FAX 530+538+2099  --→ CHICO PD                    ⊠008/017



| **BUTTE COUNTY SHERIFF'S OFFICE**<br>33 COUNTY CENTER DRIVE, OROVILLE, CA 95965  (530) 538-7321<br>CA0040000                                    FAX (530) 538-2099 | CRIME<br>INCIDENT<br>REPORT<br>Page 7 of 8 | Case 05-16591 |

Haas said Gabriel didn't notice the officers until they identified themselves. Haas said when Gabriel saw the officers he was shocked and he ran.

Det. Freeman asked Haas where Gabriel carried his gun when he carried it. Haas used her right hand and pressed it fl against her stomach and motioned into her waist band on the right side of her stomach. Haas said she thought Gabrie was right handed. Det. Freeman asked Haas if Gabriel ever shot the gun and she said Gabriel shot the gun into a targe in the back yard. Haas said Gabriel would fire the gun approximately once a week. Haas said three days prior, Gabri got new bullets for the gun and he wanted to shoot it. Haas said she and Gabriel shot the gun. Haas said no one else wanted to shoot the gun. Haas said Gabriel loaded the gun and gave it to her.

I asked Haas to describe the gun and she described it as "littler" and black and similar to a Glock. I asked Haas if she knew the difference between a semi-automatic pistol and a revolver. Haas explained that a revolver had a piece that came out towards the side (the cylinder) and you had to put the bullets in; and semi-automatic you had to pull back on something (the slide).

Haas confirmed that Gabriel's gun was a semi-automatic. Haas said the day she fired Gabriel's gun, he put the bullets in the magazine and then put the magazine into the gun. Haas said she fired approximately five rounds from the gun. asked Haas if Gabriel reloaded the gun when they were done and she said no. I asked Haas if she knew whether Gabriel ever reloaded the gun and she no.

Haas said Gabriel was the only person in the house that had a gun. Haas said there was another gun in the house that was grey in color and larger then Gabriel's gun, but no one ever shot that gun. Haas said a lot of people have touched the gun, but they didn't have any bullets for it. At that point we ended our conversation with Haas and returned her to holding cell.

**Robert Allen Studdard III** (03/19/04).

Signature/ID#:                                      Reviewed By:

# EXHIBIT B

Apartment #5:  While I was knocking on the door for apartment #44, a college-aged white female walked by in the parking lot and yelled to me that she had not been interviewed yet and that she lived in apartment #5. She said she saw the entire incident.

I responded to apartment #5 and spoke at length with resident Savannah "Rose" Lang (̶██████̶, ̶██████████̶). Lang provided the following statement in summary:

At about 1:30 pm that day, Lang was sweeping her house and stepped out onto the concrete patio to sweep the trash outside. She saw a silver car driving through the parking lot. She assumed it was a neighbor going to check his/her mail. She said she was looking down when she heard a male voice yell phrases similar to, "Stop right now!", "Get on the ground!", and "Put your hands up!".

Lang looked up to see two police officers exiting the silver car she had seen seconds earlier. She said a light skinned, possibly Hispanic, male and a younger female, about 18 years old, were running away from the police officers toward Pomona Ave. She said the female looked scared and dropped immediately to the ground when the officer gave commands. She said the male threw his hands up and continued running away from the officers.

Lang said she heard 4 or 5 shots and saw the male fall to the ground. She said she did not actually see the shots hit him because a red truck and a tree

blocked her view. She indicated that the silver car, red truck and [obviously] the tree were still there.

<u>Note</u>: I later took 3 photographs of the scene from her front porch. In one photo, I let her place me exactly where she estimated she had been standing, and I had her look through the viewfinder on my cell phone to ensure what I was seeing was the vantage point she had at the time. It is important to note that I am about 5 inches taller than Lang, and that it was dark when I was speaking with her, but had been lighter at the time of the incident. The three photographs referenced above will be sent, along with this report, to the investigators compiling the documentation.

Lang indicated she did not see the male who had been shot again until she saw him being lifted up on the stretcher when he was being transported to the hospital. She said a small fence blocked her view of the actual location where the male fell after being shot.

Lang indicated the driver of the silver car was the officer who shot the male. She said the officers were not in full uniforms but were wearing something black that indicated they were police officers. She said both officers were holding guns in their hands. She said the officers went separate ways around the car as they approached the male and female. She said that after the shooting, one of the officers yelled, "Shots fired. Shots fired."

Lang said the male had his hands up and she did not see a gun in his hands. She said she was 87 to 89% sure he did not have a gun.

I told Lang that detectives would possibly want to follow-up with her at a later date. She said that would be fine.

END OF INTERVIEWS.

Submitted by Lt. Corinne Beck, CSU, Chico Police Department

11/11/15



# *Butte County District Attorney's Office*
25 County Center Drive ● Oroville, CA  95965-3385
(530) 538-7411 *office* ● (530) 538-7071 *fax*

## INVESTIGATION REPORT
### Supplemental

UNIT: Major Crimes Division                               DATE: 11/10/2015

CASE NUMBER: DA1500363

CATEGORY: Officer Involved Shooting Incident

CRIME:

INVESTIGATOR: Jason Barkley, Investigator

| Suspect Name: | DOB: | Address: | | Telephone: |
|---|---|---|---|---|
| Eddie Gabriel Sanchez | 02/10/1981 | 7057 Clark Rd #3 , Paradise, Ca 95969 | | (530)321-8146 |

| Victim Name: | DOB: | Address: | | Telephone: |
|---|---|---|---|---|
| | | | | |

| Witness Name: | DOB: | Address: | | Telephone: |
|---|---|---|---|---|
| Eddie Sanchez | | 5564 Foster Road , Paradise, Ca 95969 | | (530)877-4706 |
| Daniel Robert Sanchez | 02/19/1984 | Po Box 3263 , Paradise, Ca 95967 | | ( )877-6942 |

## INVESTIGATION

On November 12, 2015 District Attorney Investigative Lt Juan Diaz and I met with Savannah Lang in order to conduct a follow up interview with her   Lt Diaz and I met with Lang at 621 Pomona Ave, Chico Butte County California.  This interview took place in front of her apartment, apartment number 5 on the ground floor  The following is a summary of Lt Diaz and my conversation with Savannah

Savannah said she had just returned home from school and was sweeping the inside of her house  Savannah explain that because she lives on the ground floor she sweeps everything out the front door of her apartment

Savannah said while she was sweeping off her front porch area she saw and heard a silver car pull up and park quickly. Savannah used a non-verbal sound to communicate tires screeching. Savannah said initially she did not realize the vehicle was a police unit because it was unmarked Savannah said she saw someone get out of the silver vehicle and begin yelling commands. Savannah said when she heard the subject begin yelling she looked up.

Savannah said the officer yelled one line similar to "stop right now," or "put your hands up." Savannah said she believed the officers was wearing a black vest and she observed a gun, which is how she recognized the subject as a Law Enforcement Officer

Savannah described that she was standing on her front porch observing what was happening Savannah placed herself on leaning on the front porch railing to the east of the bamboo privacy screen and to the west of the 4X4 wooden support beam Savannah described a red Toyota Tacoma being parked in the parking stall directly in front of the decorative light post, which is located in front of apartment number 5. The placement of the vehicle would have significantly limited the view of the incident

Through the process of the interview Savannah described seeing Sanchez and a female walking just east of the sidewalk on Pomona Ave, in the parking lot of 621 Pomona Ave Savannah said when the police exited the vehicle and began making commands the female subject stopped and did what she was told. Savannah said the male subject ran away from the officers (East Bound).

Savannah said she lost sight of Sanchez because the truck was blocking her view Savannah said she heard the officer fire, when her view of Sanchez was blocked by the truck. Savannah said after she heard the shots, Sanchez moved back into her view and appeared to be falling forward with his hands out and slightly up at approximately shoulder level. Savannah demonstrated what she saw, it appeared to me Savannah was describing Sanchez's hands going put to brace himself. Savannah said she only saw Sanchez when he was falling, specifically the time after the shot, and Sanchez fell to the ground. Savannah said she could only see Sanchez' head and part of his shoulder. Savannah her view was limited by the trees in the area as well

I explained to Savannah the initial Officer who interviewed her had a different idea of what her statement was. I explained the Officer believed Savannah said Sanchez had his hands up as if he was giving up Savannah said this was not accurate. Savannah explained she saw Sanchez' hands up as if he was falling Savannah said "I don't think he was like, no, I'm giving up, no it's like he got shot and was going down." Savannah agreed that what she saw was after the shots were fired

I asked Savannah if it was accurate to say that she did not see Sanchez with a gun. Savannah said that was accurate. Savannah said she saw both of his hands and they did not have a gun. I reminded Savannah that her statement was she saw his hands empty after she heard shots. Savannah agreed but said she did see Sanchez running away. Savannah said she did not remember seeing a gun in Sanchez' had as he ran away. Savannah went on to say she was not looking for a gun either.

I asked Savannah if Sanchez was running away from her position. Savannah said yes. I asked Savannah if she would have been able to see if Sanchez was pulling a gun from his waist band, from that vantage point. Savannah said she would not have been able to see Sanchez pulling a gun in that manner. Savannah said Sanchez could have very well have had a gun in his waistband and she would not have seen it.

It should be noted Savannah said she is 5 foot 2 inches tall. Her height would have played a role in what she could have seen with a mid-sized truck parked in front of her.

For further information refer to audio recording and photographs

## CONCLUSION/RECOMMENDATION

Attach to Original Case File.

_____          Approved by _____

Jason Barkley
*Investigator,*
*Butte County District Attorney's Office*

*Lieutenant,*
*Butte County District Attorney's Office*



## CLAIM FOR MONEY OR DAMAGES AGAINST THE CITY OF CHICO

**Before completing this form, please read the "Instructions for Filing A Claim."**

File With: City of Chico City Clerk's Office
Hand Delivery: 411 Main Street, Third Floor
Mailing Address: P.O. Box 3420, Chico, CA 95927-3420

Official Use Only

Claim #: **RECEIVED**

**MAY 0 6 2016**

**CITY CLERK
CITY OF CHICO**

| SECTION 1: CLAIMANT INFORMATION | |
|---|---|
| Name of Claimant<br>GABRIEL ISAIAH SANCHEZ ELDRIDGE | Telephone Number (including area code)<br>(831) 794-1736 |

| Mailing Address |
|---|
| 2278 LUCRETIA AVENUE, APT. 4 |

| City<br>SAN JOSE | State<br>CA | Zip<br>95122 |
|---|---|---|

| Claimant(s) Date(s) of Birth<br>JUNE 24, 2005 | Social Security Number | Driver License Number<br>N/A | Gender<br>☑ Male  ☐ Female |
|---|---|---|---|

| Name Of Person/Insurance Company/Attorney To Which Notices Should Be Sent, If Different Than Claimant |
|---|
| DANIEL E. WILCOXEN, WILCOXEN CALLAHAM, LLP |

| Address To Which Notices Should Be Sent, If Different<br>2114 K STREET | City<br>SACRAMENTO | State<br>CA | Zip<br>95816 |
|---|---|---|---|

**SECTION 2: CLAIM INFORMATION**

Type of Claim
☐ Property Damage   ☐ Personal Injury   ☑ Other. Explain:   SEE ATTACHMENT

Dollar Amount of Claim*       *If your claim amount exceeds $10,000, no dollar amount is to be listed. However, you must indicate whether the claim would be limited or unlimited civil case.
☐ Limited Civil Claim ($10,000 - $24,999)   ☑ Unlimited Civil Claim ($25,000 or more)

How Was The Claim Amount Computed? (Attach All Supporting Documentation)
SEE ATTACHMENT

| Date of Incident<br>11/10/15 | Time of Incident<br>APX. 1:30 PM   AM / PM | If you are filing this claim more than six months beyond the date of incident, please see instructions for filing a Late Claim Application. |
|---|---|---|

Location of Incident
630 POMONA AVENUE, CHICO, CA

| Name of Employee(S) and/or City Department Believed to Be Involved<br>SEE ATTACHMENT | Police Department Report No.<br>15-7829 |
|---|---|

Describe the specific damage or injury incurred as a result of the incident. (Attach additional sheets as necessary)
SEE ATTACHMENT

Describe the circumstance that led to the alleged damage or injury. State all the facts that support your claim against the City of Chico, and why you believe the City is responsible for the alleged damage or injury. (Attach additional sheets as necessary)
SEE ATTACHMENT

**SECTION 3: WITNESS INFORMATION**

| 1. Name of Witness | Address | Telephone Number |
|---|---|---|
| SEE ATTACHMENT | | |
| 2. Name of Witness | Address | Telephone Number |
| | | |
| 3. Name of Witness | Address | Telephone Number |
| | | |

**SECTION 4: AUTO INSURANCE INFORMATION**

Has a Claim for Alleged Damage/Injury Been Filed or Will be Filed With your Insurance Company?
☒ No  ☐ Yes

| Name of Insurance Company | Broker/Agent Name |
|---|---|
| | |

| Insurance Company Mailing Address | City | State | Zip |
|---|---|---|---|
| | | | |

| Type of Insurance | Policy Number | Limits of Insurance and Deductible |
|---|---|---|
| | | |

| Vehicle Make | Model | Year |
|---|---|---|
| | | |

Vehicle Registered Owner

**SECTION 5: MEDICAL CARE INFORMATION**

| Have You Sought Medical Treatment Related to Your Claim? | Was Any Part of the Treatment Costs Covered by Medicare or SSDI? |
|---|---|
| ☒ No  ☐ Yes | ☒ No  ☐ Yes |

| Name of Doctor/Hospital Providing Treatment | Attending Physician |
|---|---|
| | |

| Address | City | State | Zip |
|---|---|---|---|
| | | | |

| Telephone Number (including area code) | Treatment Date(s) |
|---|---|
| | |

**SECTION 6: NOTICE AND SIGNATURE**

If applicable, please attach any repair bills, estimates or similar documents supporting your claim.

**The complete claim form along with one copy of all related documents must be filed with the City of Chico City Clerk's Office.** The City Clerk's Office is the ONLY office to which claims may be submitted. Claims sent to any other department will be not considered valid formal claims, and will not be responded to. You may not receive any further notice.

A claim for money or damages against the City of Chico pursuant to the California Tort Claims Act (Gov. Code §810 et seq.) shall be filed by the claimant or a person acting on his or her behalf using this form only (G.C. §910.4) and shall include the information requested below. (If additional space is needed, please attach a separate sheet, identifying the paragraph being answered.)

**Warning:** Presentation of a false claim is a felony (Penal Code §72). Penal Code states, "Every person who, with intent to defraud, presents for allowance or for payment to any state board or officer, or to any county, city, or district board or officer, authorized to allow or pay the same if genuine, any false or fraudulent claim, bill, account, voucher, or writing, is punishable either by imprisonment in the county jail for a period of not more than one year, by a fine of not exceeding one thousand dollars ($1,000), or by both that imprisonment and fine, or by imprisonment pursuant to subdivision (h) of Section 1170, by a fine of not exceeding ten thousand dollars ($10,000), or by both such imprisonment and fine." Pursuant to Code of Civil Procedure §1038, the City may seek to recover from you all costs of defense in the event an action is filed which is later determined not to have been brought in good faith and with reasonable cause.

You or your representative are required to sign this form (G.C. §910.2).

| Signature | Date |
|---|---|
| *Janice E. Wedmaker* | 05/05/16 |

<u>ATTACHMENT TO CLAIM FOR MONEY OR DAMAGES</u>
<u>AGAINST THE CITY OF CHICO</u>

<u>SECTION 2  CLAIM  INFORMATION</u>

<u>TYPE OF CLAIM:</u>

      The conduct of the Chico Police Department, Officer Mark Bass, Officer Mark Bass' supervisors, including the Chief of the Chico Police Department and the City of Chico, include but are not limited to:

      Civil assault;
      Civil battery;
      Negligence;
      Gross negligence;
      Recklessness;
      Civil rights violations including federal constitution claims actionable under 42 U.S.C. 1983 and California constitutional claims;
      Wrongful death;
      Punitive damages against Officer Mark Bass.

<u>HOW WAS THE CLAIM AMOUNT COMPUTED?</u>

      Wrongful death case, damages include the loss of love, comfort, companionship and support and the value of the case is in excess of $10,000.

<u>DESCRIPTION OF THE INDEBTEDNESS OBLIGATION INJURY DAMAGE OR LOSS</u>
<u>INCURRED AS FAR AS KNOWN TO THE CLAIMANT HEREIN</u>:

      As a result of the acts and omissions described hereinabove, Eddie Gabriel Sanchez was killed at approximately 1:30 p.m. on November 10, 2015.

      As a result of his death, his heir has sustained general damages in an amount to be determined, as well as other incidental damages.

<u>NAME OF THE PUBLIC EMPLOYEE WHO CAUSED THE INJURY</u>:

      Chico Police Department;
      Officer Mark Bass;
      Officer Bass' supervisors, including the Chief of the Chico Police Department;
      City of Chico.

<u>DESCRIBE THE SPECIFIC DAMAGE OR INJURY INCURRED AS A RESULT OF THE INCIDENT:</u>

Based on the facts and circumstances set forth hereinabove, Claimant seeks and is entitled to recover exemplary and punitive damages against Officer Mark Bass, and general and special damages against the Chico Police Department and/or any other supervisory and/or employees against whom liability is proven.

On November 10, 2015, Chico Police Department officers Mark Bass and David Bailey were attempting to arrest Eddie Gabriel Sanchez, age 34, pursuant to an arrest warrant issued on November 10, 2015, at or about the location of 630 Pomona Avenue, Chico, California. Decedent, Eddie Gabriel Sanchez (hereafter EGS), was a suspect in two robberies which had occurred in the City of Chico, wherein a semi-automatic handgun was allegedly used.

In that surveillance video of the robbery was available and shown on television, Mary Romero, the mother of EGS, recognized the suspect and reported to the Chico Police Department that she believed it was her son. Mary Romero and EGS's brother, Daniel Sanchez, told the police that EGS lived at 630 Pomona Avenue, Chico, California. This report was made by the family to stop her son from engaging in this action and to protect him from being killed by the police.

Officers Mark Bass and David Bailey encountered the suspect EGS at the above location at approximately 1:30 p.m. on November 10, 2015. At this encounter, three shots were fired by Officer Bass' pistol, two of which struck EGS in the head, resulting in his death. Officer Bass' pistol, a Glock Model 21 Semi-Automatic 45 caliber pistol was fired three times and two rounds struck EGS in the face as set forth hereinabove.

At autopsy, projectiles recovered from the decedent EGS were later found to be consistent with being fired by Officer Bass' above-described Glock Model 21 Semi-Automatic 45 caliber pistol. Said rounds were hollow point rounds.

Immediately prior to being shot and killed by Officer Mark Bass, decedent EGS was walking with witness Keiana Haas, whose address is 223 Harrison Street, Etna, California. Witness Keiana Haas observed the entire incident. A statement was taken from witness Keiana Haas which was recorded and videoed by the Chico Police Department. Said statement is in the custody of the Chico Police Department at this time, and a typed partial transcript is attached hereto as Exhibit A. Contained in said statement, witness Keiana Haas testified the decedent did not have a gun in his hand when he was shot, but she observed the police officers remove a pistol from the waistband of decedent EGS after he was shot. Allegedly, decedent EGS was attempting to run away from officers Bass and Bailey at the time he was shot. However, witness Haas' statement and the autopsy indicates he was shot in the face at a distance of approximately 10 feet from the officers, with no gun in his hand.

Witness Savannah Rose Lang, whose address is 621 Pomona Avenue, Apt. 5, Chico, California, was statementized by police agencies on two occasions. On both occasions, she testified there was no gun in decedent EGS's hand. In the first statement, witness Lang testified that defendant had his hands up in the air when he was shot, and she stated in her subsequent statement that he may have had his hands in front of him to break his fall, but nonetheless was not holding a gun, or anything else, in his hand. See Exhibit B.

Decedent EGS was the father of Claimant Gabirel Isaiah Sanchez Eldridge, age 10, whose date of birth is June 24, 2005 and is currently living with his mother, Amanda Marie Eldridge, at 2278 Lucretia Avenue, Apt. 4, San Jose, California 95122.

Officer Mark Bass, by engaging in the conduct described hereinabove, in the absence of an objective threat by the decedent EGS, constituted conduct which was more than ordinary negligence, in that he was acting either intentionally, recklessly or grossly negligently, and acted in violation of the decedent EGS's constitutional rights under the 4th, 5th, 8th and 14th Amendments to the United States Constitution, and similar or analogous provisions of the California Constitution.

Officer Mark Bass breached general law enforcement and constitutional standards of conduct by using deadly force in an unjustified situation. Said conduct also constituted negligent and/or intentional wrongful death of decedent EGS. Chico Police Department and its Police Chief and other supervisors had an obligation to select and train and retain mentally stable officers. Officer Bass' past conduct confirms that the Chico Police Department and Officer Bass' superiors knew he had past complaints of grossly improper conduct, establishing he was unfit to be a police officer. Complaints, which were repressed by the police department, establish that Officer Bass lacked adequate mental stability and training with regard to arrests, safety, the use of weapons, generally and with deadly force, at the time of the events set forth herein. Thus, at the time of his conduct during the events described herein occurred, he was unfit and negligently retained by the Chico Police Department, his supervisors and superiors. Acting under color of law, the Chico Police Department, its Chief, and Officer Bass' supervisors, lacked and failed to implement and enforce appropriate and adequate policies and procedures to prevent the events which occurred in this instance.

Officer Bass received inappropriate psychological evaluations and screenings, was inappropriately supervised and/or disciplined based on his known past conduct, resulting in the death of EGS. The allowance of Officer Bass to continue as an armed police officer by the Chico Police Department, created an obvious danger that he would inflict an unconstitutional injury or death upon citizens, including the decedent, EGS. The failure to provide and ensure that the police officers of the Chico Police Department received appropriate training and followed said training, or be removed from their ranks as unstable and dangerous officers, shows a reckless and grossly negligent and/or deliberate indifference to the constitutional rights of citizens such as Eddie Gabriel Sanchez, and the public at large.

EGS was killed by Officer Bass while he was on duty, acting under the color of law, within the apparent scope and authority of his position as a police officer. The death of decedent EGS and damages to his heir were a foreseeable result of the Chico Police Department's knowledge of the inadequacies and bizarre behavior and failures of Officer Bass prior to the event causing the death of Eddie Gabriel Sanchez, and was an actual and proximate cause of EGS's death. Officer Bass and his supervisors and the Chico Police Department thereby violated the state and federally guaranteed civil rights of EGS and his heir, Gabriel Isaiah Sanchez Eldridge. The conduct of Officer Bass, including the unreasonable shooting and resultant death of the unarmed suspect amounted to unlawful seizure under the 4th, 5th, 8th, and 14th Amendments of the United States Constitution, and is actionable under 42 U.S.C. 1983 by the heir of EGS. It also constituted a depravation of the constitutional rights of EGS and his heir to substantive procedural due process under the 4th, 5th, 8th, and 14th Amendments of the United States Constitution, and provisions of the California Constitution.

DESCRIBE THE CIRCUMSTANCES THAT LED TO THE ALLEGED DAMAGE OR INJURY. STATE ALL THE FACTS THAT SUPPORT YOUR CLAIM AGAINST THE CITY OF CHICO, AND WHY YOU BELIEVE THE CITY IS RESPONSIBLE FOR THE ALLEGED DAMAGE OR INJURY.

See above.

SECTION 3: WITNESS INFORMATION

| | Name of Witness | Address | Telephone No. |
|---|---|---|---|
| 1. | Officer Mark Bass | Chico Police Department | Unknown |
| 2. | Officer David Bailey | Chico Police Department | Unknown |
| 3. | Keiana Haas | 223 Harrison Street, Etna, CA | Unknown |
| 4. | Savannah Rose Lang | 621 Avenue, Apt. 5, Chico, CA | Unknown |

# EXHIBIT A

Apartment #5:  While I was knocking on the door for apartment #44, a college-aged white female walked by in the parking lot and yelled to me that she had not been interviewed yet and that she lived in apartment #5. She said she saw the entire incident.

I responded to apartment #5 and spoke at length with resident Savannah "Rose" Lang (▓▓▓▓▓, ▓▓▓▓▓▓▓). Lang provided the following statement in summary:

At about 1:30 pm that day, Lang was sweeping her house and stepped out onto the concrete patio to sweep the trash outside. She saw a silver car driving through the parking lot. She assumed it was a neighbor going to check his/her mail. She said she was looking down when she heard a male voice yell phrases similar to, "Stop right now!", "Get on the ground!", and "Put your hands up!".

Lang looked up to see two police officers exiting the silver car she had seen seconds earlier. She said a light skinned, possibly Hispanic, male and a younger female, about 18 years old, were running away from the police officers toward Pomona Ave. She said the female looked scared and dropped immediately to the ground when the officer gave commands. She said the male threw his hands up and continued running away from the officers.

Lang said she heard 4 or 5 shots and saw the male fall to the ground. She said she did not actually see the shots hit him because a red truck and a tree

blocked her view. She indicated that the silver car, red truck and [obviously] the tree were still there.

Note: I later took 3 photographs of the scene from her front porch. In one photo, I let her place me exactly where she estimated she had been standing, and I had her look through the viewfinder on my cell phone to ensure what I was seeing was the vantage point she had at the time. It is important to note that I am about 5 inches taller than Lang, and that it was dark when I was speaking with her, but had been lighter at the time of the incident. The three photographs referenced above will be sent, along with this report, to the investigators compiling the documentation.

Lang indicated she did not see the male who had been shot again until she saw him being lifted up on the stretcher when he was being transported to the hospital. She said a small fence blocked her view of the actual location where the male fell after being shot.

Lang indicated the driver of the silver car was the officer who shot the male. She said the officers were not in full uniforms but were wearing something black that indicated they were police officers. She said both officers were holding guns in their hands. She said the officers went separate ways around the car as they approached the male and female. She said that after the shooting, one of the officers yelled, "Shots fired. Shots fired."

Lang said the male had his hands up and she did not see a gun in his hands. She said she was 87 to 89% sure he did not have a gun.

I told Lang that detectives would possibly want to follow-up with her at a later date. She said that would be fine.

END OF INTERVIEWS.

Submitted by Lt. Corinne Beck, CSU, Chico Police Department

11/11/15



**Butte County District Attorney's Office**
25 County Center Drive ● Oroville, CA 95965-3385
(530) 538-7411 *office* ● (530) 538-7071 *fax*

## INVESTIGATION REPORT
Supplemental

**UNIT:** Major Crimes Division                    **DATE:** 11/10/2015

**CASE NUMBER:** DA1500363

**CATEGORY:** Officer Involved Shooting Incident

**CRIME:**

**INVESTIGATOR:** Jason Barkley, Investigator

| Suspect Name: | DOB: | Address: | Telephone: |
|---|---|---|---|
| Eddie Gabriel Sanchez | 02/10/1981 | 7057 Clark Rd #3 , Paradise, Ca 95969 | (530)321-8140 |

| Victim Name: | DOB: | Address: | Telephone: |
|---|---|---|---|
|  |  |  |  |

| Witness Name: | DOB: | Address: | Telephone: |
|---|---|---|---|
| Eddie Sanchez |  | 5564 Foster Road , Paradise, Ca 95969 | (530)877-4706 |
| Daniel Robert Sanchez | 02/19/1984 | Po Box 3263 , Paradise, Ca 95967 | (   )877-6942 |

## INVESTIGATION

On November 12, 2015 District Attorney Investigative Lt. Juan Diaz and I met with Savannah Lang in order to conduct a follow up interview with her. Lt. Diaz and I met with Lang at 621 Pomona Ave, Chico Butte County California. This interview took place in front of her apartment, apartment number 5 on the ground floor. The following is a summary of Lt. Diaz and my conversation with Savannah.

Savannah said she had just returned home from school and was sweeping the inside of her house. Savannah explain that because she lives on the ground floor she sweeps everything out the front door of her apartment

Savannah said while she was sweeping off her front porch area she saw and heard a silver car pull up and park quickly. Savannah used a non-verbal sound to communicate tires screeching. Savannah said initially she did not realize the vehicle was a police unit because it was unmarked. Savannah said she saw someone get out of the silver vehicle and begin yelling commands. Savannah said when she heard the subject begin yelling she looked up.

Savannah said the officer yelled one line similar to "stop right now," or "put your hands up." Savannah said she believed the officers was wearing a black vest and she observed a gun, which is how she recognized the subject as a Law Enforcement Officer.

Savannah described that she was standing on her front porch observing what was happening. Savannah placed herself on leaning on the front porch railing to the east of the bamboo privacy screen and to the west of the 4X4 wooden support beam. Savannah described a red Toyota Tacoma being parked in the parking stall directly in front of the decorative light post, which is located in front of apartment number 5. The placement of the vehicle would have significantly limited the view of the incident.

Through the process of the interview Savannah described seeing Sanchez and a female walking just east of the sidewalk on Pomona Ave, in the parking lot of 621 Pomona Ave. Savannah said when the police exited the vehicle and began making commands the female subject stopped and did what she was told. Savannah said the male subject ran away from the officers (East Bound).

Savannah said she lost sight of Sanchez because the truck was blocking her view. Savannah said she heard the officer fire, when her view of Sanchez was blocked by the truck. Savannah said after she heard the shots, Sanchez moved back into her view and appeared to be falling forward with his hands out and slightly up at approximately shoulder level. Savannah demonstrated what she saw, it appeared to me Savannah was describing Sanchez's hands going put to brace himself. Savannah said she only saw Sanchez when he was falling, specifically the time after the shot, and Sanchez fell to the ground. Savannah said she could only see Sanchez' head and part of his shoulder. Savannah her view was limited by the trees in the area as well

I explained to Savannah the initial Officer who interviewed her had a different idea of what her statement was. I explained the Officer believed Savannah said Sanchez had his hands up as if he was giving up. Savannah said this was not accurate. Savannah explained she saw Sanchez' hands up as if he was falling  Savannah said "I don't think he was like, no. I'm giving up, no it's like he got shot and was going down." Savannah agreed that what she saw was after the shots were fired.

---

I asked Savannah if it was accurate to say that she did not see Sanchez with a gun. Savannah said that was accurate. Savannah said she saw both of his hands and they did not have a gun. I reminded Savannah that her statement was she saw his hands empty after she heard shots. Savannah agreed but said she did see Sanchez running away. Savannah said she did not remember seeing a gun in Sanchez' had as he ran away. Savannah went on to say she was not looking for a gun either.

I asked Savannah if Sanchez was running away from her position. Savannah said yes. I asked Savannah if she would have been able to see if Sanchez was pulling a gun from his waist band, from that vantage point. Savannah said she would not have been able to see Sanchez pulling a gun in that manner. Savannah said Sanchez could have very well have had a gun in his waistband and she would not have seen it.

It should be noted Savannah said she is 5 foot 2 inches tall. Her height would have played a role in what she could have seen with a mid-sized truck parked in front of her.

For further information refer to audio recording and photographs.

## CONCLUSION/RECOMMENDATION

Attach to Original Case File.

_____
Jason Barkley
*Investigator,*
*Butte County District Attorney's Office*

Approved by: _____
*Lieutenant,*
*Butte County District Attorney's Office*

# EXHIBIT B

11/13/2015 FRI 15:18  FAX 530+538+2099  --- CHICO PD                                    ☑003/017



| BUTTE COUNTY SHERIFF'S OFFICE<br>33 COUNTY CENTER DRIVE, OROVILLE, CA 95965  (530) 538-7321<br>CA0040000                          FAX (530) 538-2099 | CRIME<br>INCIDENT<br>REPORT<br>Page 2 of 8 | CASE C15-13691<br>CONNECTED |
|---|---|---|

Narrative

<u>Source/Probable Cause:</u>
On 11/10/15 at approximately 1400 hours, I was instructed to go to the Chico Fire Training Center. I was informed that officers from the Chico Police Department had been involved in an Officer Involved Shooting (OIS) and that the county wide shooting protocol team was being activated.

<u>Arrival/Investigation</u>
At approximately 1830 hours, Det. Freeman, Det, Calkins and I were assigned to speak to four individuals who had been removed from the home at 630 Pomona Av. Det. Freeman, Det, Calkins and I were informed that the four individuals were potential witnesses to the shooting, especially a female detainee (Keiana Haas) who was walking wit the decedent at the time of the shooting. Det. Freeman, Det, Calkins and I were tasked with getting statements from th four individuals.

<u>Keiana Haas (04/04/96):</u>
Det. Freeman and I conducted the first interview with Keiana Haas. The interview was conducted at the Chico Police Department (CPD) in one of their holding cell interview rooms. The interview was digitally recorded for audio and video. A copy of the interview was later transferred to DVD and booked into evidence at the Butte County Sheriff's Office. What follow is a summary of that interview.

Prior to speaking to Hass, Det. Freeman advised Haas of her rights from a standard Miranda card. After each advisement Det. Freeman asked Haas if she understood her right and she indicated that she did. I was present for Det. Freeman's Miranda admonishment of Haas.

Haas said she was 19 years old and the mother of a two year old girl. Haas said she lived in the town of Etna, which was near Yreka in northern California. Haas said she had a friend, identified only as "Karen" (19 years of age), that lived on Pomona Av. Haas said Karen's house was "a few" house east of 630 Pomona Av towards the Pomona West Apartment complex. Haas said she did not know Karen's address, but that the home was on the same side of the road as the Pomona West Apartments. Haas said she lived in Etna, and Karen came to pick her up so she could stay with he in Chico, until 11/18/15. Haas said Karen drove an older blue Honda accord style car. Haas said she came to town on or about Thursday (11/05/15) and she had been staying with Karen.

Haas said just prior to the shooting she was walking around the neighborhood, using her cellular phone looking for free Wi-Fi. Haas said she found a spot near 630 Pomona Av, which had a decent Wi-Fi reception. I asked Haas if she knew any of the people at the house and she said no. Haas said she walked down the driveway "a ways" to access the Wi-Fi.

Det. Freeman asked Haas if she had ever been to that house before and she said no. I told Haas that at some point, something took place. I asked Haas to tell me what took place. Haas said "the guy that got shot", who she did not know, grabbed her hand and said 'hey will you walk me across the street.' Haas said she told "the guy" that she would walk with him.

"The guy" was later identified as Edward Gabriel Sanchez and herein will be referred to as Gabriel. It should be noted at during the first portion of the interview Haas referred to Gabriel as "the guy" or "he", and insisted she didn't know Gabriel. It was not until the second interview Haas admitted knowing Gabriel and began calling him by name. In fact,

Signature/ID#: _____  35/126      Reviewed By: _____  5 15



**BUTTE COUNTY SHERIFF'S OFFICE**
33 COUNTY CENTER DRIVE, OROVILLE, CA 95965  (530) 538-7321
CA0040000                    FAX (530) 538-2099

| CRIME INCIDENT REPORT | CASE | Cis- 16391 |
|---|---|---|
| Page 3 of 8 | CONNECTED | |

Detectives didn't use the name Gabriel until the second part of the interview. For the purposes of this report, the decedent will be referred to as Gabriel.

Haas said as she and Gabriel got to the other side of the street two guys jumped out of a car. Haas said one of the guy was wearing a pink button up shirt and a black vest. Haas said the other guy was wearing a black shirt and a black ve Haas said the two males had guns and they told them to stop, at which time Gabriel ran off and they (the police) shot him. Haas said she stood still and then they told her to lay on the ground, so she did.

After Haas provided her account of the incident, I started from the beginning for additional details. Haas said she had walked approximately half of the way down the driveway (at 630 Pomona Av) to look for Wi-Fi, to just past the front house, near a log.

I asked Haas if she found it odd, that Gabriel (who she didn't know) would ask her to walk across the street and she said "kinda". Det. Freeman asked Haas if Gabriel said anything else to her and she said "he told me that he had a gun" Haas said Gabriel said 'will you walk me across the street,' and 'I have a gun'. I asked Haas if she saw the gun and si said no. I asked Haas why Gabriel would tell her that and she said she didn't know.

Det. Freeman asked Haas if she was frightened by the mention of the gun and she said no. Haas said Gabriel didn't threaten her with the gun, nor did he seem threatening. Haas said Gabriel seemed "kinda weird" and he seemed like h wanted someone to walk with him.

Haas said she and Gabriel were on the other side of the street, at the other side walk, when the two officers got out of the silver car. I asked Haas if she saw the silver car, prior to being contacted and she said no. I asked Haas what she and Gabriel were talking about she said nothing. Haas said she and Gabriel were just walking. Haas said Gabriel grabbed her hand and was pulling her as they walked. Haas said she pulled her hand away, and he grabbed it again. Haas said Gabriel was holding her hand, but she felt as though she could leave if need be.

I asked Haas to better describe the two officers. Haas said one of the males, was an older white male with grey hair ar pink shirt and a vest. The other male was a middle aged white male with a black shirt and vest. Haas described the vests as being a "cop vest" with white lettering which said "Sheriff" or "Police" on it. I asked Haas if she identified th lettering and individuals as being law enforcement and she said "ya". Haas said the silver car was parked in the parking lot to her left and looked as though it was pulling out towards the road.

Haas said the two police officers said "freeze police" and Gabriel ran. I asked Haas what Gabriel did the second they saw the police. Haas said "he (Gabriel) just froze, then he ran off." I asked Haas where Gabriel ran to when he ran an she said "to the right." I asked Haas if Gabriel stopped and she said no, they shot him.

I asked Haas if she ever saw Gabriel pull the gun out, and she said no. I asked Haas if Gabriel said anything when he started to run and she said no. I asked Haas if the police said anything when Gabriel started to run and she said "they said stop." I asked Haas if Gabriel responded and she said "nope."

I asked Haas if Gabriel was wearing long or short sleeves and she said "short sleeves." I asked Haas if Gabriel was holding anything in his hands, cell phone, anything and she said "no." I asked Haas if she saw anything in Gabriel's hands when he started to run and she said no.

asked Haas who shot their gun and she said the man in the pink shirt. I asked Haas how many times the guy in pink shot and she said twice. I asked Haas if the other officer shot and she said "I don't think so." Haas said after the

Signature/ID#: _____  EG/84   Reviewed By: _____ JV 5-15

11/13/2015 FRI 15:18  FAX 530+538+2099  →→→ CHICO PD                     @005/017



| | BUTTE COUNTY SHERIFF'S OFFICE<br>33 COUNTY CENTER DRIVE, OROVILLE, CA 95965  (530) 538-7321<br>CA0040000                      FAX (530) 538-2099 | CRIME<br>INCIDENT<br>REPORT<br>Page 4 of 8 | CASE:  C15-16 391<br>CONNECTED: |
| --- | --- | --- | --- |

officers shot, Gabriel fell and the officers told her to lay down. Haas said she was lying prone on the sidewalk, parall-
to the street with her head facing towards Gabriel.

Det. Freeman asked Haas how far she and Gabriel were from the police officers when they first contacted them. Haas
estimated that she was approximately 10 feet from the police at first contact. Det. Freeman asked Haas how far she
thought Gabriel was from their original position, before the officers fired. Haas said not that far, maybe a couple of
feet. Haas said as soon as Gabriel turned to run, she heard them shoot. I asked Haas if she thought Gabriel went as fa
as one corner in the interview room to the other and she said maybe. It should be noted that the interview room was
approximately 8'x6', making the diagonal distance approximately 10'. Haas indicated that it could have been less tha
that.

I asked Haas what happened after Gabriel was down. Haas said the guy in pink seemed in shock. Haas said the guy in
pink was telling the other officers "he's got a gun, he's got a gun. Check him, check him." Haas said three officers
approached Gabriel cautiously and turned him over.

Haas said the new group of officers rolled Gabriel to his side and located the gun. Haas said she saw the gun and said
was a small one. Haas said she thought the gun was in Gabriel's waist band. Haas made a motion towards the right
waist band area, over the right hip in the front.

Det. Freeman asked Haas if she saw the officers remove the gun and she said yes. Haas said the officer removed the
gun and they threw it to the side. I asked Haas if she was close to Gabriel when the officers rolled him and she said
yes. I asked Haas if she was the same distance as the room and she said yes, approximately 10 feet. Haas said the
officers turned Gabriel onto his left side, and his belly button was facing Pomona Av. Haas said officers checked to se
if Gabriel was breathing and then they started CPR.

Det. Freeman asked Haas if she was sure she saw the Officers remove the gun from Gabriel's waist band or if it was
lying on the ground. Haas said "no, he pulled it off of him." Det. Freeman asked Haas if she was sure the officers
pulled the gun from Gabriel's waist band and she said yes.

I asked Haas if the officers had to pull the shirt up to expose the gun and she said yes. Det. Freeman asked Haas if the
shirt was completely untucked and Haas said yes.

I confirmed with Haas that the officer in pink yelled that Gabriel had a gun, prior to Gabriel being rolled over and she
indicated yes. I asked Haas if the officer in pink said Gabriel had a gun prior to her seeing the gun and she said "ya."
asked Haas if the officer said there was a gun prior to Gabriel being rolled over and she said "ya". I asked Haas if the
officer said Gabriel had a gun before the other group of officers were even at Gabriel and she said yes.

I asked Haas what the officer in black was doing. Haas said the officer in black was standing to the right of the one in
pink, pointing his gun at Gabriel. Haas said the officer in pink seemed in shock, like he had never shot anybody before
Haas said she figured cops shot a lot of people. Det. Freeman and I explained we had never shot anyone and she was
surprised. Haas said the officer in pink seemed like he didn't want to have to shoot. I asked Haas if the officer seemed
excited or happy that he shot and she said "no." Haas said the officer seemed like he didn't wanna "do it", but he'd
thought about it and he did it. Haas said after the officer found the gun, the officer in the pink shirt was pacing around.

I asked Haas about her being handcuffed. Haas said another officer handcuffed her. Haas said the handcuffs were a
pretty tight, causing some minor discomfort. Haas said no force was used by the officers. Haas showed me her wrists
and I noticed some minor red lines on her wrist. Haas said she did not need any medical attention. Haas said she was

Signature/ID#: _____        Reviewed By: _____  5-15

11/13/2015 FRI 15:19   FAX 530+538+2099   --- CHICO PD                        ☒006/017



| BUTTE COUNTY SHERIFF'S OFFICE | CRIME INCIDENT REPORT | CASE C15-1639| |
|---|---|---|
| 33 COUNTY CENTER DRIVE, OROVILLE, CA 95965  (530) 538-7321 | Page 5 of 8 | CONNECTED |
| CA0040000                FAX (530) 538-2099 | | |

searched and transported to the police department. I asked Haas if she was questioned by anyone else and she said no
I asked Haas if she spoke to anyone from the point of "freeze police" up until we spoke to her and she said no. Haas
said a female officer asked her name and date of birth, but that was it.

Det. Freeman asked Haas what Gabriel was wearing. Haas said Gabriel was wearing black pants and a fitted shirt.
Det. Freeman asked Haas if the shirt was baggy and she said it was pretty fitted and not too baggy.

I asked Haas how Gabriel seemed as they walked towards the road. Haas said Gabriel seemed agitated. I asked Haas
Gabriel seemed nervous and she said he seemed like he just wanted to "get away". Haas said "he seemed like he was
not himself", that "he seemed like he wanted to go somewhere". Haas insisted that she never met Gabriel and that she
had never been to that house before.

Det, Freeman asked Haas if everything we'd discussed was the truth and she said yes. Det. Freeman and I left the room
at that point.

Det. Freeman and I spoke to Det. Hass from Chico Police Department. Det. Hass said he spoke to Detectives at the
crime scene, who discovered mail and Haas' personal property inside of the house. Det. Hass said detectives found a
large stack of mail addressed to Haas and women's underwear at the house inside one of the rooms at the house.

Det. Freeman re-contacted Haas with the new information and she said she had been staying at the house.

' asked Haas how well she knew Gabriel and she said not that well. Haas stated she knew Gabriel as Gabriel and that
she had known him for a couple of days. Haas said she had just meet Gabriel. Haas said she just meet Gabriel when
she came to town on Thursday. Haas said Karen introduced her to Gabriel after she came to town. Haas said she
started staying at 630 Pomona Av on or about Thursday. Haas said Gabriel, Robert "bobby", Rafael and Dewey were
all at the house. Haas said Dewey was her daughter's uncle.

Haas said she was actually at the gate, when Gabriel walked up and asked her to walk with him across the street. Det.
Freeman asked Haas if she knew Gabriel had the gun prior to him saying anything. Haas said she knew Gabriel had a
gun, because she had seen it.

I asked Haas how Gabriel had been during the day. Haas said Gabriel had been fine. I asked Haas if Gabriel had been
paranoid that day and she said Gabriel was always paranoid. Haas said when Gabriel saw her sitting outside he seemed
"really paranoid."

I bluffed Haas and asked her to tell me about the surveillance cameras. Haas said she didn't think the cameras
recorded. Haas said there was a camera that faced the front porch and there was a camera that faced the rear porch.

Haas said that was the first time she had stayed at the house. Det. Freeman asked Haas why she didn't think her
staying at the house was important and she said just didn't think it was important. I asked Haas if she and Gabriel were
in a dating relationship and she said no.

I asked Haas if she knew Gabriel was dead and she said "ya". It should be noted that Haas did not express any emotion
when I told her that Gabriel was dead.

Signature/ID#: _____        Reviewed By: _____ S-05

11/13/2015 FRI 15:19   FAX 530+538+2099   →→ CHICO PD                                    ☑007/017



**BUTTE COUNTY SHERIFF'S OFFICE**
33 COUNTY CENTER DRIVE, OROVILLE, CA 95965  (530) 538-7321
CA0040000                                      FAX (530) 538-2099

| CRIME INCIDENT REPORT | CASE | C15-16391 |
|---|---|---|
| Page 6 of 8 | CONNECTED | |

I asked Haas if she was having a sexual relationship with Gabriel and she said no. I asked Haas if she was having a romantic relationship with anyone in the house and she said "Dewey". I asked Haas if anyone in the house mentioned anything happening over the weekend and she said "not that I know of".

I asked Haas if there was anything different about the story she told before, now that I knew she had been staying at the house and she said "just that I knew him (Gabriel)."

I asked Haas to tell me again, from start to finish, honestly, what happened since she came to town. Haas said she and Dewey came to town with Karen to party and let some stress out. Haas said she woke up in the morning and called her mom to check in.

Haas said she woke up next to Dewey at approximately 1100 hours. Haas said Gabriel was asleep on the couch in the living room and Rafael was asleep in Gabriel's room. Bobby was asleep in his room. I asked Haas to draw me a sketch of the house and the locations of all the individuals inside. After Haas drew the house and room, she labeled the areas where everyone was located. Haas then signed and dated the bottom of the photo. I attached a copy of that sketch to this report and booked the original into evidence at the Sheriff's Office.

Haas said she woke up, milled around the house for some time, went outside, and went back to the bedroom to wake up Dewey. I asked Haas what was going on the night before and she said everyone was partying. Haas said they drank some alcohol and smoked some marijuana. I asked Haas if anyone smoked any methamphetamine and she said no. Haas said Gabriel was the only one that "really did that".

Haas said the morning of the shooting everyone in the house wanted to "get a bottle" (indicating they wanted alcohol), but she wanted to get something to eat. I asked Haas if any of the individuals in the house worked and she said no. Haas said they were on public assistance. Haas said they all had EBT cards.

Det. Freeman asked Haas if she saw anyone go out the back door to use the bathroom, prior to going outside to check for Wi-Fi and she said no.

While with Dewey, she heard Gabriel's mother pounding on the back door to the house yelling to Gabriel. Haas said Gabriel's mother walked around to the front of the house and had a conversation with Gabriel. Haas said Gabriel gave his mother a black duffle bag that he claimed had Christmas gifts for his children.

Haas said Gabriel and his mother had a conversation approximately ten feet away from the front porch. Haas said Gabriel's mother was telling him that she could help him and that he needed to go with her. Haas said Gabriel's mother was crying and seemed very upset and worried. Haas said Gabriel seemed annoyed or bothered by his mother's visit.

Haas said Gabriel went into the house and came out with the bag. Haas demonstrated that the bag was approximately two feet long, with a single zipper and a handle. Haas said the bag was full. Haas said Gabriel's mother was still crying when he gave her the bag.

I asked Haas what Gabriel's demeanor was after his mother left. Haas said Gabriel didn't seem that upset by the visit. Haas said Gabriel went back into the house and was playing on his phone by the front window. Haas said she went outside with Dewey and Rafael. Haas said it was approximately an hour, from when Gabriel's mother left and he came ...utside asking her to walk across the street with him. Haas said nothing regarding the rest of the incident changed.

Signature/ID#: _____   Reviewed By: _____ C-15



**BUTTE COUNTY SHERIFF'S OFFICE**
33 COUNTY CENTER DRIVE, OROVILLE, CA 95965  (530) 538-7321
CA0040000
FAX (530) 538-2099

| CRIME INCIDENT REPORT |
|---|
| Page 7 of 8 |

CASE: 015-16391

Haas said Gabriel didn't notice the officers until they identified themselves. Haas said when Gabriel saw the officers he was shocked and he ran.

Det. Freeman asked Haas where Gabriel carried his gun when he carried it. Haas used her right hand and pressed it fl against her stomach and motioned into her waist band on the right side of her stomach. Haas said she thought Gabrie was right handed. Det. Freeman asked Haas if Gabriel ever shot the gun and she said Gabriel shot the gun into a targe in the back yard. Haas said Gabriel would fire the gun approximately once a week. Haas said three days prior, Gabri got new bullets for the gun and he wanted to shoot it. Haas said she and Gabriel shot the gun. Haas said no one else wanted to shoot the gun. Haas said Gabriel loaded the gun and gave it to her.

I asked Haas to describe the gun and she described it as "littler" and black and similar to a Glock. I asked Haas if she knew the difference between a semi-automatic pistol and a revolver. Haas explained that a revolver had a piece that came out towards the side (the cylinder) and you had to put the bullets in; and semi-automatic you had to pull back on something (the slide).

Haas confirmed that Gabriel's gun was a semi-automatic. Haas said the day she fired Gabriel's gun, he put the bullets in the magazine and then put the magazine into the gun. Haas said she fired approximately five rounds from the gun. asked Haas if Gabriel reloaded the gun when they were done and she said no. I asked Haas if she knew whether Gabriel ever reloaded the gun and she no.

Haas said Gabriel was the only person in the house that had a gun. Haas said there was another gun in the house that was grey in color and larger then Gabriel's gun, but no one ever shot that gun. Haas said a lot of people have touched the gun, but they didn't have any bullets for it. At that point we ended our conversation with Haas and returned her to holding cell.

**Robert Allen Studdard III (03/10/04).**



FSC
www.fsc.org

MIX

Paper from
responsi~ ~ces

FSC® ᵢₛ  ᵢ18





80000 SERIES • 30% P.C.W.
www.kleer-fax.com

RECYCLED



**HUMAN RESOURCES
AND RISK MANAGEMENT OFFICE**

411 Main Street – 1st Floor          (530) 879-7900
P.O. Box 3420                        Fax (530) 895-4733
Chico, CA 95927                      http://www.ci.chico.ca.us

*Calendared*
*LD to File Complaint 12/20/16*
*File*

JUNE 20, 2016

Daniel E. Wilcoxen
Wilcoxen Callaham, LLP
2114 K Street
Saramento, CA 95816

### NOTICE OF REJECTION OF CLAIM

Claimant:            Gabriel Isaiah Sanchez Eldridge
Date of Incident:    November 10, 2016

Notice is hereby given that the claim presented to the City of Chico on May 10, 2016, in an amount that would place it in the unlimited civil case jurisdiction of the superior court, on behalf of your client, was denied by the undersigned Risk Manager of the City on June 20, 2016.

### WARNING

Subject to certain exceptions, you have only six (6) months from the date this notice was personally delivered or deposited in the mail to file a court action on your <u>state law</u> claims.  See Government Code Section 945.6.  This notice does not apply to any claim you may have under federal law, and your time for filing an action on any federal law claim may be less than six months.

Please also be advised that, pursuant to Section 1038 of the California Code of Civil Procedure, the City will seek to recover all costs of defense in the event an action is filed in the matter and it is determined that the action was not brought in good faith and with reasonable cause.  The False Claims Act, commencing with section 12650 of the California Government Code, also applies to claims filed with the City.

Sincerely,

Frank Fields
Administrative Services Director

Claim #:      D-14-20-1451

cc:    City Attorney
       City Clerk (L-Gen-5 Claim File)
       York Insurance Services Group, Inc.

## PROOF OF SERVICE

I am a citizen of the United States and am a resident of the County of Butte.  I am over the age of 18 years and not a party to the within action.  My business address is 411 Main Street, Chico, California 95928.

On this date, I served the following document(s) described as:

### NOTICE OF REJECTION OF CLAIM

Claimant:             Gabriel Isaiah Sanchez Eldridge
Date of Incident:     November 10, 2016

on the parties below by placing a true copy thereof in a sealed envelope and served same on the parties/counsel, addressed as follows:

Daniel E. Wilcoxen
Wilcoxen Callaham, LLP
2114 K Street
Saramento, CA 95816

The following is the procedure in which service of this document was effected:

___X___   MAIL:  By depositing the sealed envelope with the United States Post Office, Chico, California, with the postage fully paid.

_____   MAIL:  By placing for collection in a designated receptacle for outgoing mail to be retrieved by the City of Chico mail clerk who upon receipt of such mail will processes it for pickup by Discount Mail Service, Inc., who will affixes the appropriate prepaid postage to the envelope(s) and deposits at the United States Post Office.

_____   FAX AND MAIL:  I personally sent to the addressee(s) facsimile number indicated above a true copy of the above-described document(s) before 5:00 p.m.  I verified transmission without error by a transmission report issued by the facsimile machine upon which said transmission was made immediately following the transmission. Thereafter, I placed a true copy in a sealed envelope and mailed to the above addressee(s) in the manner described above.

_____   OVERNIGHT DELIVERY:  I caused delivery by overnight courier/delivery/U.S. Postal Service to the person(s) at the address(es) listed above.

_____   PERSONAL SERVICE

I declare under penalty of perjury that the foregoing is true and correct and that this document is executed at Chico, California, on June 20, 2016.

_____
Amber Foster